**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNIVERSAL MARITIME SERVICE
CORPORATION,
Petitioner,

v.

No. 97-2129

BERNARD N. WRIGHT; DIRECTOR,
OFFICE OF WORKERS' COMPENSATION
PROGRAMS, UNITED STATES
DEPARTMENT OF LABOR,
Respondents.

On Petition for Review of an Order
of the Benefits Review Board.
(97-346, 97-346S)

Argued: January 28, 1998

Decided: August 19, 1998

Before LUTTIG and MICHAEL, Circuit Judges, and
GOODWIN, United States District Judge for the
Southern District of West Virginia, sitting by designation.

_____

Affirmed in part, vacated in part, and remanded by published opinion.
Judge Michael wrote the opinion, in which Judge Luttig and Judge
Goodwin joined.

_____

**COUNSEL**

**ARGUED:** Lawrence Philip Postol, SEYFARTH, SHAW, FAIR-
WEATHER & GERALDSON, Washington, D.C., for Petitioner.

Malcolm McLaurin Crosland, Jr., THE STEINBERG LAW FIRM, L.L.P., Mount Pleasant, South Carolina, for Respondents.

_____

**OPINION**

MICHAEL, Circuit Judge:

This workers' compensation case involves a dispute over the meaning of "wages" as defined in § 2(13) of the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. §§ 901-950 (LHWCA or Act). Universal Maritime Service Corporation (Universal Maritime) petitions this court to review a decision of the Benefits Review Board in which the Board interpreted "wages" to include vacation, holiday, and container royalty payments received by employees under a collective bargaining agreement. Universal Maritime contends that these payments are "fringe benefits" that the Act specifically excludes from the definition of "wages." Alternatively, the company argues that if these payments are wages, then Bernard Wright's receipt of these payments while he was disabled resulted in a (post-injury) wage-earning capacity that reduces his compensation under the Act. Because we conclude that (1) these payments are "wages" if they are earned through actual work and (2) Wright's receipt of this pay did not reflect his wage-earning capacity after his injury, we affirm the Board in part. However, we vacate in part and remand because the record is unclear as to whether vacation, holiday, and container royalty payments should be included in Wright's (pre-injury) "average weekly wages."

I.

A.

On April 17, 1995, Bernard Wright seriously injured a finger in the course of his employment with Universal Maritime at the Port of Charleston, South Carolina. Because his injury rendered him temporarily and totally disabled from April 17, 1995, through December 31, 1995, Universal Maritime paid him temporary, total disability compensation. These payments, however, were based on an average

2

weekly wage that did not include Wright's historical earnings from vacation, holiday, and container royalty payments. [1] Instead, they were calculated from an average weekly wage of $591.34 that compensated Wright only for the loss of his hourly wage rate.

Wright received the vacation, holiday, and container royalty payments pursuant to a collective bargaining agreement between the South Carolina Stevedores Association (SCSA) and his local chapter of the International Longshoremen's Association (ILA). This agreement set the wage rates for covered employees and required that the employers make monetary contributions into employee benefit funds that provide for (1) vacation and holiday payments, (2) container royalties, (3) pension and welfare benefits, and (4) Guaranteed Annual Income payments. To explain these contract provisions in their proper context, we begin with a discussion of pertinent aspects of the shipping industry.

B.

In the shipping industry a stevedore is an entity that loads and unloads cargo from merchant vessels at port.[2] Stevedores usually are

_____

[1] In 1994, the year prior to his injury, Wright received $4,368.00 in vacation and holiday payments and $14,259.11 in container royalty payments. In 1995 Wright's vacation and holiday pay remained the same, while his earnings from container royalties increased to $16,240.14.

[2] Our discussion of the shipping industry draws from a variety of sources. See, e.g., Howlett v. Birkdale Shipping Co., 512 U.S. 92, 96 (1994); Jones & Laughlin Steel Corp. v. Pfeifer , 462 U.S. 523, 528 (1983); Federal Maritime Comm'n v. Pacific Maritime Ass'n, 435 U.S. 40, 46 n.9 (1978); Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 254 n.4 (1977); Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 455 & n.9 (1948); Steamship Trade Ass'n v. Commissioner, 757 F.2d 1494, 1495-96 (4th Cir. 1985); Local 1814, Int'l Longshoremen's Ass'n v. Waterfront Comm'n, 667 F.2d 267, 269-70 (2d Cir. 1981); United States v. International Longshoremen's Ass'n, 460 F.2d 497, 499, 502-03 (4th Cir. 1972); id. at 504-06 (Boreman, J., concurring); Notice of Request by ILWU-PMA Pension Plan, 63 Fed. Reg. 5573, 5575 (1998); Longshoring and Marine Terminals, 59 Fed. Reg. 28,594, 28,630 (1994) (proposed rules); Air Contaminants, 57 Fed. Reg. 26,002, 26,492 (1992) (proposed rules); Notice of Request by STA-ILA Pension Plan, 53 Fed. Reg. 40,805, 40,807 (1988); American Bar Association, The Developing Labor Law 509, 1533 (Patrick Hardin ed., 3d ed. 1992).

independent companies that contract with shipowners to handle the cargo, although shipowners occasionally act as their own stevedores. Longshoremen, in turn, are persons hired by stevedoring concerns to perform the actual loading and unloading of goods. Most longshoremen are not permanent employees of any one stevedore or maritime carrier. Instead, their employment is casual in nature and is usually limited to the task of loading or unloading a specific ship that has arrived at port. Once the ship's cargo has been loaded or unloaded, the employment ends. Consequently, the work schedule of a longshoreman can be "highly variable and unpredictable, from day to day, week to week, and season to season" since "[t]he amount of work available depends on the number of ships in port and their length of stay." Aaron, 344 U.S. at 455.

Longshoremen typically perform their duties in groups of twelve to twenty workers known as longshoring "gangs." The gang operates as a unit with longshoremen distributed between the ship and the pier to allow for the uninterrupted transfer of cargo. Moreover, membership in gangs often is fixed, which allows "permanent" gangs to become more efficient from teamwork developed over time. [3]

Because longshoremen do not have permanent employers, they traditionally have received job assignments though a union-organized "hiring hall" system in which workers are referred to stevedores as work becomes available. Under this system, longshoremen usually do not receive piecemeal paychecks from each individual employer. Instead, their wages are often (if not always) paid through an entity that centralizes payroll accounts, collects wages from employers, and issues a single, aggregate check to each employee.

This fluid employment relationship between longshoremen and their employers also affects the process of labor negotiations.[4] Union

_____

[3] Some ports, however, use a daily shapeup system in which stevedores pick individual longshoremen from the "shape" to form gangs.
[4] The Senate report accompanying the Maritime Labor Agreements Act of 1980 describes the collective bargaining process in the longshoring industry. See S. Rep. No. 96-854, at 3-4 (1980), reprinted in 1980 U.S.C.C.A.N. 2447, 2449-50. Compare also Hampton Roads Shipping Ass'n v. International Longshoremen's Ass'n, 746 F.2d 1015, 1016-17 (4th Cir. 1984) (describing local and master collective bargaining agreements); The Developing Labor Law, supra , at 509.

contracts in the industry are negotiated between the union and multi-employer bargaining units which represent groups of stevedores, maritime carriers, and marine terminal operators. Historically, contract negotiation has involved a two-step process in which the ILA (representing longshoremen on the Atlantic and Gulf coasts) first negotiates a master contract with a committee of regional stevedore and shipping associations. Although the employers that are parties to the master contract do not represent all stevedoring companies, carriers, and terminals on the Atlantic and Gulf coasts, the agreement nevertheless forms the basis for contract negotiations at each port between the local association of employers and the local chapter of the ILA.

Since the late 1950s the most contentious disputes in these union-employer negotiations on the Atlantic and Gulf coasts have centered on the technological innovation of containerized cargo and its impact on the longshoring industry.[5] Prior to containerization,

> [c]argo arriving at the pier by truck was "transferred piece by piece from the truck's tailgate to the ship by longshoremen. . . . The longshoremen checked the cargo, sorted it, placed it on pallets and moved it by forklift to the side of the ship, and lifted it by means of a sling or hook into the ship's hold. The process was reversed for cargo taken off incoming ships."

ILA II, 473 U.S. at 64. Containerization, however, "profoundly transformed this traditional pattern." Id.

> Containers are large metal boxes [ranging from 20 to 40 feet in length that are] designed to fit without adjustment into the holds of special ships and onto the chassis of special trucks

_____

[5] A series of Supreme Court and lower court decisions chronicles the history of labor disputes spawned by containerization. See NLRB v. International Longshoremen's Ass'n, 473 U.S. 61, 64-66 (1985) (ILA II); NLRB v. International Longshoremen's Ass'n, 447 U.S. 490, 493-99 (1980) (ILA I); International Longshoremen's Ass'n, 266 N.L.R.B. 230, 243-47 (1983) (ILA) (providing history of containerization and labor strife), enforcement denied sub nom. American Trucking Ass'ns v. NLRB, 734 F.2d 966 (4th Cir. 1984), aff'd sub nom. ILA II.

and railroad cars. "Because cargo does not have to be handled and repacked as it moves from the warehouse by truck to the dock, into the vessel, then from the vessel to the dock and by truck or rail to its destination, the costs of handling are greatly reduced. . . . [Moreover], a container ship can be loaded or unloaded in a fraction of the time required for a conventional ship."

Id. at 64 n.1. Because containers can be stuffed (packed) and stripped (unpacked) at locations away from the pier, cargo transported in containers can travel without intermediate handling. In addition, containers eliminate the need to load and unload cargo piece by piece. As a result, containerization has "drastically reduced. . . [t]he amount of work available for longshoremen." ILA I, 447 U.S. at 495. It is easy to see why the 1957 arrival in the Port of New York of the first ocean-going container ship set the stage for bitter labor disputes between the ILA and maritime employers.

In 1959, when containerization was still in its infancy, the ILA agreed to a master contract that recognized the right of stevedoring concerns to handle any type of container in exchange for royalty payments that employers would make for all containers stuffed or stripped by non-ILA labor away from the pier. This was but the first container royalty negotiated by the union. The second royalty was negotiated in the 1971 master contract following a strike along the entire Atlantic and Gulf coasts that was triggered by issues relating to containerization. The royalties, which apply only to containers that pass intact over the piers, were a part of the larger collective bargaining agreement that included the Rules on Containers. The Rules, which were upheld in ILA II as a lawful work preservation agreement, essentially provide that only ILA longshoremen (and the employees of the cargo's beneficial owner) can stuff or strip containers within 50 miles of the port. Together, the Rules and the container royalties have the effect of partially preserving the traditional role that longshoremen have played in the loading and unloading of oceangoing merchant vessels. In 1977 the ILA's master contract added a third container royalty and reaffirmed the Rules on Containers.

C.

The local collective bargaining agreement between the ILA and SCSA in this case is a product of this history. It specifies that a steve-

6

dore must give preference in employment to those permanent gangs that regularly work for it and that a union-run hiring hall must provide a system for employers to call in orders for gangs. Of course, the contract also sets hourly wage rates for the various types of longshoring work.

In addition to an hourly rate of pay, longshoremen are entitled to vacation, holiday, and container royalty payments. The local contract provides certain workers with sixteen days of holiday pay and up to six weeks vacation pay. These "holidays" and "vacations," however, do not guarantee time off work but, instead, promise a predetermined amount of pay based on a fixed hourly rate and the worker's holiday and vacation days. Longshoremen who have worked 700 or more hours in a contract year (October 1 to September 30) are eligible for these payments, which are made in December (vacation pay) and June (holiday pay) after the contract year. These payments are made by an employer-funded trust governed by employer- and union-appointed trustees who must "establish such procedures as necessary to provide for" the vacation and holiday payments described above. The trustees are empowered to "establish such assessments [on employers] as necessary to supplement the fund as needed to meet its anticipated financial responsibilities."

The local agreement also incorporates the container royalty provisions of the 1990 master contract. Among other things, this master agreement provides that "[t]he two Container Royalty payments, effective in 1960 and 1977, respectively, shall be continued and shall be used exclusively for supplemental cash payments to employees covered by [the agreement], and for no other purpose." The local contract adopts this provision and adds that employers must "pay into a fund for supplemental cash benefits [specified] amounts . . . as a royalty when loading or discharging containers" stuffed or stripped by non-ILA personnel. These contributions for the first and third container royalties "must be used only and exclusively for cash disbursements to the men." Like the vacation and holiday payments, the royalties are paid to employees by a trust whose trustees are jointly appointed by the union and the employers. Unlike the situation with the vacation and holiday fund, however, the trustees are charged with establishing the terms and conditions governing the disbursement of the royalty money. Historically, employees who have worked 700 or

7

more hours in a contract year have been paid (in December after the contract year) an equal share of the royalty money deposited into the fund.

Although the contract does not address whether disabled long-shoremen are eligible for these payments, the vacation/holiday and container royalty funds have both historically given disabled workers a set amount of credit towards the 700-hour eligibility thresholds for each day that the worker receives workers' compensation benefits. This practice enabled Wright, the claimant in this case, to receive credit towards eligibility for both the vacation/holiday and container royalty funds while he was disabled. During the 1994-1995 contract year he received credit for his disability from April 17, 1995, to the end of the contract year on September 30, 1995. Because his disability lasted through December 31, 1995, he also received credit from the beginning of the 1995-1996 contract year (October 1, 1995) until his disability ended. The parties have stipulated that Wright received a holiday/vacation payment as well as a container royalty payment in 1996 even though he did not work during his disability in 1995.

D.

The parties now dispute whether compensation under the Act should be calculated to include earnings from vacation, holiday, and container royalty payments. Although Universal Maritime made disability payments to Wright for his injuries, Wright brought a claim under the Act alleging that the compensation should have been calculated to include not only his hourly wage rate but also his earnings from vacation, holiday, and container royalty payments. The administrative law judge (ALJ) agreed and ruled that these payments were "wages" under § 2(13) of the Act that must be included in the calculation of his average weekly wage. The ALJ also ruled that Wright's receipt of these payments while he was disabled in 1995 neither reflected a residual wage-earning capacity nor resulted in a "double recovery." After the Benefit Review Board affirmed these rulings, see Bernard N. Wright, 31 B.R.B.S. 195, 195-96 (1997) (per curiam), Universal Maritime petitioned this court for review. **6** We now affirm the Board in part, vacate in part, and remand for further proceedings.

_____

**6** We cite the Board's decisions as"B.R.B.S." instead of the more cumbersome citation of "Ben. Rev. Bd. Serv. (MB)."

8

II.

Section 2(13)'s definition of "wages" lies at the heart of the LHWCA's compensation scheme. The Act mitigates the economic effects of job-related injuries by basing the claimant's statutory compensation on the <u>wage</u>-earning capacity that is lost due to the disabling injury. <u>See Metropolitan Stevedore Co. v. Rambo</u>, 117 S. Ct. 1953, 1957-58 (1997) (<u>Rambo II</u>). More specifically, compensation for most partial disabilities is defined to equal two thirds of the claimant's (pre-injury) "average weekly wages" minus two-thirds of his (post-injury) "wage-earning capacity." <u>See</u> 33 U.S.C. § 908(c)(21), (e).[7] When a claimant is totally disabled, he has no post-injury wage-earning capacity and is therefore compensated with two-thirds of his pre-injury average weekly wages. <u>See id.</u> § 908(a), (b); <u>cf. id.</u> at § 908(h). Consequently, the Act's definition of "wages" drives the compensation calculation by specifying what income will be used to determine the claimant's pre-injury average weekly wages and post-injury wage-earning capacity.

Universal Maritime relies on this point to make two related arguments. First, it argues that vacation, holiday, and container royalty payments are not "wages." As a result, they cannot be included in Wright's pre-injury average weekly wage that must be compensated by the company. Second, if these payments are "wages," Universal Maritime asserts that Wright received them (and thus had "wages") while he was disabled. This would give Wright a post-injury wage-earning capacity that reduces the compensation owed to him under the

_____

[7] Not all compensation is calculated from the actual loss in wage-earning capacity. Claimants with permanent partial disabilities resulting from certain types of injuries, known as "scheduled" injuries, are compensated for the permanent aspect of their disability by a lump-sum payment equal to two-thirds of their pre-injury wage for a specified period of time. <u>See</u> 33 U.S.C. § 908(c), (c)(1)-(20). Instead of basing this compensation on the actual, permanent wage loss due to the injury, the Act "conclusively presume[s]" the monetary effect of the injury. <u>See Rambo II</u>, 117 S. Ct. at 1957-58; <u>Potomac Elec. Power Co. v. Director, OWCP</u>, 449 U.S. 268, 269-71 (1980); <u>Gilchrist v. Newport News Shipbuilding & Dry Dock Co.</u>, 135 F.3d 915, 918-19 (4th Cir. 1998). Because Wright did not have a permanent, scheduled disability, however, his statutory compensation is based on his actual loss of earning capacity.

9

Act. Either way, the company argues that it is not obligated to compensate Wright for vacation, holiday, and container royalty payments. We disagree and address each argument in turn.

III.

Universal Maritime's main argument on appeal is that vacation, holiday, and container royalty payments are not "wages" because they are "fringe benefits" that the Act explicitly excludes from the definition of wages. While this argument has a superficial appeal, a close reading of the definition and an examination of the statutory history lead us to a different conclusion.

To interpret § 2(13)'s definition of "wages" we must first determine whether "the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." Robinson v. Shell Oil Co., 117 S. Ct. 843, 846 (1997). Because we conclude that the language of § 2(13) is ambiguous, we must turn to the legislative history to guide our interpretation of the Act. See Concrete Pipe & Prods., Inc. v. Construction Laborers Pension Trust , 508 U.S. 602, 627 (1993); Patterson v. Shumate, 504 U.S. 753, 761 (1992). From this history we conclude that § 2(13)'s use of the term "fringe benefits" refers only to certain benefits given to employees in addition to a regular monetary wage or salary. Because vacation, holiday, and container royalty payments are not "fringe benefits" covered by § 2(13) and because they otherwise meet the section's definition of wages when they are earned from actual work, we ultimately hold that they are "wages" which must be included in the calculation of disability compensation under the Act. We now explain our reasoning in greater detail.

A.

We begin the analysis by looking to the language of § 2(13). That provision defines "wages" to be:

> the money rate at which the service rendered by an employee is compensated by an employer under the contract of hiring in force at the time of the injury, including the rea-

10

sonable value of any advantage which is received from the employer and included for purposes of any withholding of tax under subtitle C of the Internal Revenue Code of 1954 (relating to employment taxes).[8]

33 U.S.C. § 902(13) (1994). The section continues by adding that:

The term wages does not include fringe benefits, including (but not limited to) employer payments for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan for the employee's or dependent's benefit, or any other employee's dependent entitlement.

Id. Therefore, the opening passage of § 2(13) defines "wages" to be the "money rate" of compensation that is provided (1) for the employee's services (2) by an employer (3) under the employment contract in force at the time of the injury.[9] At a minimum, this encompasses

_____

[8] Under subtitle C of the Internal Revenue Code, 26 U.S.C. §§ 3101-3510, Federal Insurance Contributions Act (FICA) taxes, see id. § 3102(a), railroad retirement taxes (if applicable), see id. at § 3202(a), and income taxes, see id. § 3402(a)(1), are withheld from an employee's paycheck. Cf. 26 U.S.C. §§ 3101, 3201 (defining FICA and railroad retirement taxes). Withholding is calculated from the employee's "wages" and "compensation" which are defined by 26 U.S.C. §§ 3121(a), 3231(e), and 3401(a), respectively.

[9] Because the Act defines "wages" as the "money rate at which the service rendered by an employee is compensated," 33 U.S.C. § 902(13) (emphasis added), "wages" measure the amount of a worker's compensation for his services in terms of an amount of money. See Webster's Third New International Dictionary of the English Language, Unabridged 1884 (Philip Babcock Gove ed., 1981) (defining "rate" as a "quantity, amount, or degree of something measured per unit of something else" (def. 4a)); see also Oxford Encyclopedic English Dictionary 1197 (Judy Pearsall & Bill Trumble eds., 3d ed. 1996) (def. 1: "a stated numerical proportion between two sets of things," especially "as the basis of calculating an amount or value"); Random House College Dictionary 1095 (rev. ed. 1980) (def. 2: "a certain quantity or amount of something considered in relation to a unit of something else"). As we will discuss, "wages" include not only monetary pay for services but also the value of

11

cash compensation meeting these conditions. However, the language of § 2(13) does not end there. It specifies that the compensation described in the opening passage of the section "includ[es]" the "reasonable value" of "any advantage" that (a) is received from the employer and (b) triggers tax withholding.**10** Finally, § 2(13) states that "fringe benefits" are not "wages." In short, wages are defined to

_____

a worker's nonmonetary compensation. Accordingly,§ 2(13) converts the value of nonmonetary compensation into a monetary equivalent and adds it to a worker's monetary pay in order to measure his overall compensation ("wages") in units of money.

Although the word "rate" standing alone often means a temporal rate (e.g., compensation per hour of work), § 2(13) does not use this meaning of the term. By defining "wages" as the "money rate" of an employee's compensation, the Act simply specifies that this compensation is to be measured in terms of a dollar amount whether or not the employee's compensation is paid in the form of currency.

**10** The structure of the first sentence of § 2(13) demonstrates that the "advantage[s]" described in the latter part of the sentence illustrate one class of the compensation defined generally in the sentence's opening passage. The word "including" in § 2(13) indicates that the reasonable value of advantages that are received from employers and trigger tax withholding will necessarily be "part of the larger [category] of" compensation for employees' services provided by employers under the prevailing employment contract. See 33 U.S.C. § 902(13); P.C. Pfeiffer Co. v. Ford, 444 U.S. 69, 77 n.7 (1979) (interpreting § 2(3) of the Act, a definitional provision with sentence structure similar to § 2(13), by holding that use of "including" indicates an element that "necessarily" is "part of the larger group" and by rejecting argument that"`including' means `and' or `as well as'"); Federal Land Bank v. Bismarck Lumber Co., 314 U.S. 95, 100 (1941) ("the term `including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle"); Jose Quinones, 32 B.R.B.S. 6, 8-10 (1998) (per curiam) (construing § 2(13) in this manner). But see Wausau Ins. Co. v. Director, OWCP, 114 F.3d 120, 121, 122 n.2 (9th Cir. 1997) (per curiam) (failing to analyze § 2(13)'s use of "including" but effectively ruling that "including" means "and" or "as well as" in holding that nonmonetary advantages are included in wages only when they are subject to tax withholding); McNutt v. Benefits Rev. Bd., 140 F.3d 1247, 1248 (9th Cir. 1998) (per curiam) (following Wausau to conclude that monetary "advantage" not subject to tax withholding is not "wage" under § 2(13)).

12

be the monetary rate of an employee's compensation, including the value of certain "advantage[s]," but excluding "fringe benefits."

Unfortunately, neither "advantage" nor "fringe benefit" is separately defined by the Act. When a statute uses terms that Congress has left undefined, we normally give such terms their"ordinary or natural meaning." Smith v. United States, 508 U.S. 223, 228 (1993). However, because the "`meaning of statutory language, plain or not, depends on context,'" we must consider "not only the bare meaning of the word but also its placement and purpose in the statutory scheme." Bailey v. United States, 516 U.S. 137, 145 (1995). Thus, "[t]he plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." Robinson, 117 S. Ct. at 846.

If we were to interpret the meaning of "fringe benefits" according to its dictionary definition without reference to the rest of § 2(13), its meaning would be clear. Dictionaries converge on a common interpretation of the term: a "fringe benefit" is a benefit provided to an employee in addition to a regular monetary wage or salary. See, e.g., Oxford Encyclopedic English Dictionary 555 ("an employee's benefit supplementing a money wage or salary"); Random House College Dictionary 530 ("a benefit, as free insurance, received by an employee in addition to his regular pay"); Webster's Third New International Dictionary 912 ("an employment benefit (as a pension, a paid holiday, or health insurance) granted by an employer that involves a money cost without affecting basic wage rates"). While this meaning is consistent with the examples of fringe benefits given in § 2(13), it conflicts with the use of the term in the context of that section as a whole.

Section 2(13) explicitly includes in wages the reasonable value of "any advantage" that meets two conditions. Webster's defines "advantage" as a "benefit, profit, or gain of any kind." Webster's Third New International Dictionary 30 (def. 2a); see also Oxford Encyclopedic English Dictionary 19 (def. 2: "benefit, profit"); Random House College Dictionary 20 (def. 1: "anything that is of benefit or gain to someone or something"). This expansive meaning is reinforced by the use of the word "any" to modify "advantage." See United States v.

13

Wildes, 120 F.3d 468, 470 (4th Cir. 1997) ("`the word `any' has an expansive meaning, that is, `one or some indiscriminately of whatever kind.'" (quoting United States v. Gonzales , 117 S. Ct. 1032, 1035 (1997))). The bare language itself therefore suggests that "any advantage" includes benefits of any kind, including nonmonetary benefits. This reading is consistent with the term's immediate context in § 2(13). The section uses the phrase "reasonable value of any advantage" to describe one class of compensation that falls within its general definition of wages. "Reasonable value," when read in conjunction with the word "any" and the term "money rate" in the preceding passage, indicates that "any advantage" was meant to include nonmonetary advantages. Cf. Wausau, 114 F.3d at 121 (nonmonetary compensation is "advantage" under § 2(13)).

Obviously this interpretation of "any advantage" (which encompasses nonmonetary benefits) is in tension with a definition of "fringe benefits" as benefits given in addition to a regular monetary salary. If we were to read "fringe benefits" to mean all benefits given to an employee in addition to regular monetary pay, "wages" would necessarily be defined to exclude all nonmonetary compensation. This would make Congress's use of the phrase "reasonable value of any advantage" meaningless. Moreover, this conflict in the specific context of § 2(13) is not diminished by looking to the broader context of the statute as a whole.[11] Because it is an "elementary canon of construction that a statute should be interpreted so as not to render one part inoperative," Colautti v. Franklin, 439 U.S. 379, 392 (1979), we conclude that "any advantage" and "fringe benefit" cannot both be given their ordinary meanings. This creates an ambiguity that cannot be resolved by reference to the statute alone. Accordingly, we turn to the statute's history to aid our interpretation of these terms.

B.

This history leads us to conclude that Congress meant to give "any advantage" the plain meaning described above, while the term "fringe benefits" was only intended to cover a certain class of those benefits commonly referred to as fringe benefits. More specifically, the term

_____

[11] Neither "advantage" nor "fringe benefit" is used in the Act outside of § 2(13).

14

"fringe benefits" means those advantages given to an employee in addition to his regular, monetary pay whose value to the employee is too speculative to be readily converted into a cash equivalent. This conclusion is guided not only by the legislative history surrounding the 1984 amendment of § 2(13) but also by the judicial interpretation of the pre-amendment definition that was prevalent when Congress amended the section in 1984.

Section 2(13) dates back to the enactment of the LHWCA in 1927 and originally defined "wages" to mean:

> the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer.

See Longshoremen's and Harbor Workers' Compensation Act of 1927, ch. 509, § 2(13), 44 Stat. 1424, 1425 (1927). This language remained unchanged through ten revisions of the Act, see Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624, 629 & n.6 (1983), until Congress amended the section in 1984 to give it its current form. Compare LHWCA Amendments of 1984, Pub. L. No. 98-426, § 2(c), 98 Stat. 1639, 1639-40 (1984), with 33 U.S.C. § 902(13).

By 1981, however, the interpretation of the original section was well settled. The section's plain language included in wages the reasonable value of "advantages" given to employees by an employer if the advantages were "similar advantages" to "board, rent, housing, [or] lodging." The Benefits Review Board found that this language "clearly implie[d] that values received by an employee that are readily identifiable and calculable should be included" as wages. See Sonya Hilyer, 6 B.R.B.S. 754, 758 (1977), rev'd , Hilyer v. Morrison-Knudsen Constr. Co., 670 F.2d 208, 211-13 (D.C. Cir. 1981), rev'd sub nom. Morrison-Knudsen Constr. Co. v. Director, OWCP, 461 U.S. 624 (1983) (affirming Board's position). Accordingly, the Board invariably construed "wages" under § 2(13) to include vacation pay, overtime, and container royalties.[12] Similarly, the D.C. Circuit had

_____

[12] **See, e.g.**, Carolyn Sie Waters, 14 B.R.B.S. 102, 106 (1981) (vacation pay); Jesse P. Parks, 9 B.R.B.S. 462, 465-66 (1979) (container royalty

15

ruled that the value of employer-provided meals was included as "wages." See Harris v. Lambros, 56 F.2d 488, 489 (D.C. Cir. 1932). Of course, the value of some benefits were excluded from the calculation of wages. Most importantly for our purposes the Board consistently ruled that an employer's contributions to health and welfare, pension, and training benefit funds were not wages. **13** Indeed, the Board recognized in 1981 that the "law with regard to [such] fringe benefits . . . is clear." Waters, 14 B.R.B.S. at 106. When compared to "board, rent, housing, and lodging," the benefits that these funds provide to employees were found not to be "similar advantage[s]" because an employee's realization of any tangible benefits was "contingent upon the occurrence of an event which may or may not happen," making the benefits' potential value to the employee "too speculative" to include in wages. See id. at 105-06. Therefore, by 1981 the settled interpretation of "wages" included the value of an "advantage" received from an employer only when the advantage's value to the employee was readily identifiable and calculable.

Against this background, bills were introduced in the House and the Senate in 1981 that included identical provisions to amend the Act's definition of wages. Both bills proposed amending § 2(13) to read:

_____

and vacation), rev'd on other grounds sub nom. John T. Clark & Son, Inc. v. Benefits Rev. Bd., 621 F.2d 93 (4th Cir. 1980); Richard J. Cipollone, 7 B.R.B.S. 94, 97-98 (1977) (vacation and overtime); Norris Lawson, 6 B.R.B.S. 770, 776-77 (1977) (vacation); Elizabeth N. Baldwin, 5 B.R.B.S. 579, 583 (vacation), aff'd on reh'g, 6 B.R.B.S. 396, 398 (1977); Sammie L. Gray, 5 B.R.B.S. 279, 283-84 (1976) (overtime), aff'd on other grounds sub nom. General Dynamics Corp. v. Benefits Rev. Bd., 565 F.2d 208 (2d Cir. 1977).
**13 See, e.g.**, Waters, 14 B.R.B.S. at 105-06 (health); Nancy A. Freer, 9 B.R.B.S. 888, 891 (1979) (pension and health), rev'd sub nom. Duncanson-Harrelson Co. v. Director, OWCP, 686 F.2d 1336, 1343-46 (9th Cir. 1982), vacated, 713 F.2d 462 (9th Cir. 1983) (affirming Board); Lawson, 6 B.R.B.S. at 776-77 (health, accident insurance, and pension); Hilyer, 6 B.R.B.S. at 758-60 (health and welfare, pension, and training funds); Melvin E. Collins, 5 B.R.B.S. 334, 339 (1977) (pension, health and welfare).

16

> "Wages" means the money rate at which the service rendered by an employee is recompensed by the employer under the contract of hiring in force at the time of the injury, including the reasonable value of any advantage which is received from the employer and included for purposes of any withholding of tax under subtitle C of the Internal Revenue Code of 1954 (relating to employment taxes).

See H.R. 25, 97th Cong. § 2(c) (1981) (as introduced Jan. 5, 1981); S. 1182, 97th Cong. § 2(c) (1981) (as introduced May 14, 1981). This proposed revision did three things. First, it eliminated any reference to "gratuities received . . . from others than the employer." Second, it modified the general definition of wages in the opening passage of § 2(13) by requiring that compensation be recompensed "by the employer." Third, the revision broadened the illustration of the "advantage[s]" that are included in the general definition by indicating that "any advantage" received from an employer that requires employment tax withholding is covered by the definition. In doing this it abandoned § 2(13)'s requirement that an "advantage" must be "similar" to board, rent, housing, or lodging in order for it to be explicitly included as wages. The courts, however, would soon prompt Congress to add a second sentence to this proposed amendment.

In December 1981 the D.C. Circuit's decision in Hilyer v. Morrison-Knudsen Construction Co., 670 F.2d 208, 211-13 (D.C. Cir. 1981), overruled the Board's prior treatment of employer contributions to benefit funds for health and welfare, pensions, and training by treating the employer's contribution to these funds as "wages." Although the court agreed with the Board that § 2(13) "`clearly implie[d] that values received by an employee[must be] readily identifiable and calculable [to] be included'" as wages, it held that employer contributions to benefit funds for health and welfare, pensions, and training met this criterion even though the actual value that employees get from being eligible for fund benefits was "impossible to determine . . . because whether and to what extent the employee might use them is highly speculative." Id. at 211.

Congress promptly moved to undo this holding. By July 1982 the Senate amended its pending bill on the LHWCA, S. 1182, to add a second sentence to its revision of § 2(13). This sentence explicitly

17

excluded from wages "fringe benefits, including but not limited to employer payments for or contributions to . . .[employee] benefit fund[s]" of the kind addressed in Hilyer . See S. Rep. No. 97-498, at 3 (1982) (S. 1182, § 2(c)). The Senate report accompanying the bill explained that the amendment to § 2(13) "expressly rejects the holding in [Hilyer], 670 F.2d 208 (D.C. Cir. 1981)," id. at 31, and was intended "to confirm past practice and congressional intent and to reaffirm the previously settled rule that fringe benefits are excluded from the definition of `wages,'" id. at 41 (emphasis added). Because it was "previously settled" that the original § 2(13) included in wages the value of board, rent, housing, lodging, and similar advantages, the amendment's use of "fringe benefits," in contrast to the dictionary definition of the term, could not have meant all benefits given in addition to an employee's regular, monetary pay. It could only have meant a particular class of such benefits.

Although the bill passed the Senate, it failed to pass the House before the 97th Congress came to an end. See S. Rep. No. 98-81, at 22 (1983). The Senate bill was reintroduced as S. 38 in the 98th Congress and again was favorably reported out of committee. See id. at 1, 22. The committee report reiterated that the amendment to § 2(13) "expressly reject[ed] the holding in Hilyer," id. at 30, "confirm[ed] past practice and congressional intent," and "reaffirm[ed] the previously settled rule that fringe benefits are excluded from the definition of `wages,'" id. at 41.

Just fourteen days after this report was issued, the Supreme Court reversed the D.C. Circuit's Hilyer decision in Morrison-Knudsen Construction Co. v. Director, OWCP, 461 U.S. 624 (1983). The Court's analysis focused on the "plain language" of (the original) § 2(13) to interpret the meaning of the phrase the "`value of board, rent, housing, lodging, or similar advantage received from the employer.'" See id. at 629-30 (emphasis added). In holding that the benefits received from employer-funded trust funds for health and welfare, pensions, and training are not "similar advantage[s]" to board, rent, housing, and lodging, the Court said that board, rent, housing, and lodging are "benefits with a present value that can be readily converted into a cash equivalent on the basis of their market values." Id. at 630. Because the value of the benefits that an employee received from the trust funds were not "so easily converted," they

18

were found not to be similar advantages whose value is included in wages. See id.

The Court declined to base the calculation of the benefits' value on either (1) the employer's monetary contributions to the funds or (2) the value of the employee's expectation interest in fund benefits. See id. First, the Court found an employer's contributions to be "irrelevant" to this calculation because they failed to measure the value of the benefit actually received by the employees. See id. The employer's contribution also failed to measure the compensation paid for an employee's services and, therefore, the cost of these services could not be used to calculate the present value of the benefit. See id. at 630-31. Although the Court implied that the benefit's value might be measured by the cost of the services that an employee renders to earn the benefit, the fact that an employee's receipt of benefits was not directly exchanged for a specific quantity of services made calculating the benefit's value on this basis "[un]workable." See id.

Second, the Court ruled that the "value of the funds [could not] be measured by the employee's expectation interest in them." Id. at 631. The value of the tangible benefits actually received by an employee from these funds was contingent on "unpredictable" factors such as the employee's need for health and welfare services and his long-term employment with the company. See id. Consequently, the employee's future expectation interest was an insufficient measure of the benefit's value since it was "at best speculative." See id.

By rejecting these alternative bases for calculating the value of benefits under § 2(13), the Court reaffirmed the settled rule that benefits whose value is too speculative to be readily converted into a cash equivalent are excluded from the Act's definition of wages. In doing so it implied that this value normally should be calculated from the value of the tangible benefit actually received by employees. The Court's interpretation of the statute therefore closely paralleled the earlier holdings of the Board. Indeed, the Court cited the Board's decisions as being consistent with its holding, see id. at 635, and quoted S. 1182 and its accompanying report as "suggesti[ng]" that the Court's ruling was consistent with congressional intent and "previously settled" law. See id. at 633 n.10. Significantly, the Court's quo-

19

tation of S. 1182 included the amendment excluding"fringe benefits" from the definition of "wages." See id.

After Morrison-Knudsen was decided, the House passed S. 38 with only minor changes to the definition of wages. See S. 38, 98th Cong. § 2(b) (1983) (as reported to the House on Nov. 18, 1983). The pertinent House committee explained that the bill "amended [§ 2(13)'s] definition of `wages' to exclude certain fringe benefits." See H.R. Rep. No. 98-570, pt. 1, at 26 (1983), reprinted in 1984 U.S.C.C.A.N. 2734, 2759 (emphasis added). This version of the bill was adopted by the Senate and was signed into law in 1984.

This history points to three conclusions. First, the continued use of the term "advantage" in the 1984 amendment to§ 2(13) parallels its earlier usage to include the value of many forms of nonmonetary compensation in the definition of wages. Second, although the amendment's use of the phrase "any advantage" expanded the category of advantages that are used to illustrate the general definition of wages, Congress limited this expansion by requiring that these advantages must be obtained from an employer and must be subject to tax withholding. Third, after the D.C. Circuit's Hilyer decision, Congress again sought to limit this expansion and to reaffirm the previously settled view that wages do not include benefits whose value to employees is too speculative to be readily converted into a cash equivalent. This was done by amending § 2(13) to explicitly exclude "fringe benefits" from wages and by providing examples of those types of benefits that are to be excluded. Like Morrison-Knudsen, these examples directly overruled Hilyer's treatment of employer contributions to employee benefit funds.

We therefore believe that Congress intended to use the term "fringe benefits" in the 1984 amendment to § 2(13) to refer to the class of fringe benefits whose value to the employee is too speculative to be readily converted into a cash equivalent. This definition of the term is not only consistent with the history behind the passage of the 1984 amendment but it also fits harmoniously with the rest of § 2(13). First, the section's examples of fringe benefits (e.g. , employer contributions to a retirement or other benefit plan) clearly fall within the definition just mentioned. The value that an employee derives from employer contributions to retirement, pension, life insurance, and similar bene-

20

fit plans is too speculative to be readily converted into a cash equivalent because the employee's right to obtain tangible benefits is contingent on fulfilling conditions that might never be satisfied. See Morrison-Knudsen, 461 U.S. at 630-31.[14] Second, unlike the dictio-

_____

[14] Of course, it is possible to attribute a dollar value to such benefits. The D.C. Circuit's decision in Hilyer did exactly that, see 670 F.2d at 211-13, and experts regularly testify to the monetary value of these and similar items. However, a benefit's value to the employee must be readily converted into a cash equivalent within the framework established by the LHWCA in order to be "wages." Under the Act, "readily converted into a cash equivalent" had a specific meaning before Hilyer was decided by the D.C. Circuit, and this meaning was reaffirmed by Congress in the 1984 amendment to § 2(13).

When a claimant's entitlement to a tangible benefit is contingent on certain conditions that may or may not be fulfilled, the benefit's value to the employee is deemed too speculative to be included in wages. For example, participation in a health insurance plan will provide an employee with an entitlement to medical services contingent on the need of the employee and his dependents for medical care. Since this need may never arise and the employee may derive no tangible value from participation in the employer-funded plan, the potential value of the benefit is too speculative to be calculated under the Act. See Waters, 14 B.R.B.S. at 106; Freer, 9 B.R.B.S. at 891; Lawson, 6 B.R.B.S. at 776-77; Hilyer, 6 B.R.B.S. at 758-59. The same is true for life insurance and pension plans. Life insurance proceeds are paid only when certain contractual conditions are satisfied (e.g., employment by the plan sponsor at the time of death). Likewise, an employee's right to benefit from employer contributions to a pension or other retirement plan is contingent on factors such as his continued employment with a particular employer and his future achievement of retirement status. An employee who changes employers before his benefits vest or who dies before attaining retirement status will never acquire an unconditional right to payment from the plan. Consequently, his contingent right to benefit from an employer's contributions to the plan makes the potential value of these benefits too speculative to be calculated under the Act. See Freer, 9 B.R.B.S. at 891-92; Lawson, 6 B.R.B.S. at 776-77; Hilyer, 6 B.R.B.S. at 758-59. Although an employee's right to pension payments will no longer be contingent once he enters retirement, the Act's compensation for work-related injuries does not apply to post-retirement injuries incurred outside the course of employment. See 33 U.S.C.§§ 902(2), 903(a). Thus, because these benefits provide employees with a contingent right to tan-

21

nary definition of the term, the above definition does not undermine the section's statement that "the reasonable value of any advantage" (subject to two limitations) be included in wages. Because this reading of "fringe benefits" is consistent with the section and because it fits logically within the legislative history, we believe this is the intended meaning of the term.**15** Accordingly, we hold that the term "fringe benefits" as used in § 2(13) refers to those advantages, given to an employee in addition to a regular monetary salary, whose value to the employee is too speculative to be readily converted into a cash equivalent.

_____

gible benefits that depends on conditions that may never be fulfilled, the benefits' value to an employee is deemed too speculative to be converted into a cash equivalent.

When an employee's right to a tangible benefit does not depend on contingent factors like those above, however, the value of the benefit is not too speculative to be readily converted into a cash equivalent under the Act. As long as the employee earns an unconditional entitlement to a tangible benefit (even though the benefit may not be received until sometime in the future), the value of the benefit can be identified and calculated as a part of the employee's wages. See, e.g., Parks, 9 B.R.B.S. at 465-66 (ruling that wages include container royalty payment earned before but received after injury, and noting that employees normally are entitled to payments as they are earned but that union contract permitted several month delay in receipt of royalty).

**15** We reject Universal Maritime's argument (1) that Morrison-Knudsen defined fringe benefits to be all forms of benefits created after 1927 and (2) that this decision was codified by the 1984 amendment to § 2(13). First, the Court's reasoning in Morrison-Knudsen did not freeze the forms of compensation compensable under the Act at the year 1927. See 461 U.S. at 632-33. Instead the Court simply concluded that (before 1984) Congress had not intended to expand the pre-amendment definition of wages beyond the plain meaning of the 1927 Act. See id. at 633. Second, the 1984 amendment did not codify the reasoning of Morrison-Knudsen. As our discussion above reveals, Congress independently developed the language of the amended definition before the Court decided Morrison-Knudsen.

22

C.

In summary, § 2(13) defines "wages" as a dollar measure of the compensation provided (1) for an employee's services (2) by an employer (3) under the contract of hiring in force at the time of the injury. Although all compensation that meets these general requirements will fall within the affirmative definition of wages, the section expressly "includ[es]" as an illustration of such compensation the reasonable value of any advantage that is received from the employer and triggers tax withholding. See supra note 10. Finally, "wages" do not include "fringe benefits," that is, those advantages (1) given in addition to an employee's regular monetary pay (2) whose value to the employee is too speculative to be readily converted into a cash equivalent.

D.

With this general interpretation of the statute, we now turn to decide whether the holiday, vacation, and container royalty payments in this case are "wages." We conclude that these payments meet the criteria above and are wages if they are earned with actual work.

Vacation, holiday, and container royalty payments meet the first requirement of § 2(13) and are earned as compensation for "service[s] rendered by an employee," 33 U.S.C. § 902(13), when they are earned with (700 or more hours of) actual work. The vacation and holiday payments clearly are paid for services. The collective bargaining agreement states that employees "who have worked 700 hours or more in the current contract year" will receive a pre-calculated amount of vacation and holiday pay. We reject Universal Maritime's assertion that these payments must reflect a fixed, hourly rate of pay to render them compensation for services. The fact that Wright would receive the same amount of vacation/holiday pay for working 700 or 2700 hours is immaterial. If these payments are paid for services, regardless of the quantity of services, they meet the first requirement of § 2(13).[16]

_____

[16] **Morrison-Knudsen** is not to the contrary. As we discussed above, the Supreme Court suggested that the benefits in that case had to be linked

23

The same is true for container royalties. The local contract specifies that the royalty fund must be used "only and exclusively for cash disbursements for the men," and the fund trustees have traditionally paid royalties to all longshoremen who have worked 700 or more hours in the contract year. These royalties are, in effect, a wage premium paid for the handling of containers that are not stuffed or stripped by longshoremen. Since longshoring work is irregular and depends only on the amount of work to be done, the practical effect of the container royalty is to provide employees with a higher wage proportional to the amount of work lost as a result of the stuffing and stripping of containers away from the pier. Indeed, the history of labor discontent and collective bargaining over containerization reveals that these royalties were negotiated to mitigate the loss of work due to the use of containers. As more containers are stripped and stuffed by non-ILA labor, longshoremen work less (and hence lose pay) but receive more pay for the work that is done. When viewed in this context, we conclude that the container royalty is paid for the longshoring services that are actually rendered by employees (when the employees earn this payment from actual work).

Of course, the vacation/holiday and container royalty payments are compensation for "services" only when they are earned with 700 or

_____

to an exact amount of employee services in order to calculate the value of the benefit by reference to the employer's payments for these services. See 461 U.S. at 630-31; supra at 18-19. This exact correlation between the amount of services and the amount of the benefit was necessary to value the benefits in Morrison-Knudsen and make them "similar advantage[s]" to board, rent, housing, and lodging. In this case we do not ask whether vacation, holiday, and container royalty payments are "advantages" under § 2(13). Moreover, if we did ask this question, we would not have to value these benefits in reference to the labor exchanged for them since the monetary value of these cash benefits is clear. The question that we must answer is a different question than that addressed by the Supreme Court in Morrison-Knudsen: whether the benefits were received by the claimant for "service[s] rendered by an employee," 33 U.S.C. § 902(13). As we said above, a payment is made for an employee's services when it is given as compensation for the employee's work, regardless of whether it is exchanged for a specific amount of work or for the employee's services more generally.

24

more hours of actual work. If an employee works 699 hours, he normally is ineligible for these payments. Disabled employees who work less than 700 hours, however, can still become eligible if they receive enough disability credit to bring them to the 700-hour eligibility threshold. These credits are awarded not because the worker has provided "services" but because his disability prevents him from doing so. See SEACO v. Richardson, 136 F.3d 1290, 1293 (11th Cir. 1998) (per curiam) (identical credits "were not based on any services rendered by" employee to his employer). Consequently, vacation/holiday and royalty moneys earned only because of disability credit are not paid for "services" and therefore are not "wages." When an employee has worked 700 hours or more, however, such credit is unnecessary and the payments are compensation for the employee's "services."

We also conclude that the second requirement of § 2(13) is met because vacation/holiday and container royalty payments are paid "by an employer." Even though these payments are indirectly made to employees through trust funds, the true source of the payment is the employer. Stevedores and maritime carriers have agreed to a labor contract that requires them to fund the trusts and defines the payments that will be made to employees. Moreover, the unusual nature of the longshoring industry all but necessitates that all employers at a particular port act, in effect, as a single, aggregate employer of longshoremen. Because longshoremen are only "employed" by any one company for short periods of time, employer associations often centralize functions such as payroll, hiring, and collective bargaining. The reliance of these employers on centralized benefit funds to manage their vacation, holiday, and container royalty payments merely serves to channel these payments to employees through a convenient third-party entity. The payments, however, are still made "by an employer."

From our discussion of the first two factors, it is clear that Wright's vacation, holiday, and container royalty payments were made "under the contract of hiring in force at the time of the injury," 33 U.S.C. § 902(13), and thus satisfy the third requirement of § 2(13). Normally this would end our inquiry, but Universal Maritime argues that these payments were "fringe benefits." We disagree.

"Fringe benefits" are benefits (given in addition to regular pay) whose value to the employee is too speculative to be readily con-

25

verted into a cash equivalent. See supra at 22. Because vacation, holi-day, and container royalty payments are a part of Wright's regular monetary pay as a longshoreman, they are not fringe benefits. Cf. Morrison-Knudsen, 461 U.S. at 636 (contrasting fringe benefits with "take-home pay"); Bay Ridge Operating Co. v. Aaron, 334 U.S. 446, 460 (1948) ("Contracts for pay take many forms. The rate of pay may be by the hour, by piecework, by the week, month or year, and with or without a guarantee that earnings for a period of time shall be at least a stated sum."). Even if these payments were not a part of Wright's regular pay, they would still constitute wages (and not fringe benefits) because their value can be readily converted into a cash equivalent. Wright received $18,627.11 in vacation/holiday pay and container royalties in 1994. In 1995 he received $20,608.14. The value that Wright receives from these monetary payments is crystal clear. Unlike a right to future payments from a pension or retirement plan, Wright's entitlement to vacation, holiday, and container royalty payments is not contingent upon the occurrence of events that may or may not occur. Once Wright accumulates 700 hours of work, he is entitled to receive the payments from the funds. Because his right to payment is not contingent on any factors other than his ability to earn it through work, the value that Wright will receive from the payments is not sufficiently speculative to make it difficult to calculate under the Act. See supra at 20-21 & n.14. Therefore, even if we were to conclude that vacation, holiday, and container royalty payments are not part of Wright's regular pay, we would conclude that they are wages because their value to Wright can be readily converted into a cash equivalent.

Nevertheless, Universal Maritime appears to argue that the value of these payments is too speculative to be included in "wages" because the exact amount of these payments might not be known until a year after they are earned. This is partially true. The vacation, holi-day, and container royalty payments are earned in a contract year (October 1 to September 30) but are not paid until the next December and June. The company concludes that this wait to determine the exact amount of these payments would delay the calculation of a claimant's average weekly wage and, therefore, would"undermine the goal of providing prompt compensation to injured workers and their survivors," Morrison-Knudsen, 461 U.S. at 636-37. Conse-quently, the company would have us exclude such payments from

26

"wages." While we agree that this delay does complicate the calculation of an average weekly wage, the timing of the receipt of such payments cannot alter their character as wages.

Moreover, the delay does not prevent the prompt payment of compensation to disabled workers. Universal Maritime assumes that Wright's average weekly wage can only be calculated under § 10(a) by using the actual amount of wages earned in the year prior to his injury. Because the amount of the container royalty will not be known until sometime after the contract year ends, the company concludes that this will unreasonably delay Wright's compensation.[17] The company errs, however, in assuming § 10(a) is the only option under the Act. If § 10(a) "cannot reasonably and fairly be applied" to determine the average weekly wage, § 10(c) requires that the claimant's "average . . . earnings shall be . . . [calculated to] reasonably represent the . . . earning capacity of the injured employee." See 33 U.S.C. § 910(c) (emphasis added). "[T]he prime objective of[this subsection is] to insure that compensation awards [are] based on accurate assessments of the claimants' earning capacity." Tri-State Terminals, Inc. v. Jesse, 596 F.2d 752, 756 (7th Cir. 1979); see also Meehan Seaway Serv. Co. v. Director, OWCP, 125 F.3d 1163, 1169 (8th Cir. 1997); Empire United Stevedores v. Gatlin, 936 F.2d 819, 823 (5th Cir. 1991) (per curiam); Hawthorne v. Director, OWCP, 844 F.2d 318, 320 (6th Cir. 1988); Palacios v. Campbell Indus., 633 F.2d 840, 843 (9th Cir. 1980). Therefore, § 10(c) "explicitly recognizes that the mechanical formula for benefit computation [in § 10(a)] must be disregarded where the formula would distort a claimant's actual earning capacity." Hastings v. Earth Satellite Corp., 628 F.2d 85, 95 (D.C. Cir. 1980);

_____

[17] Normally, a claimant's average weekly wage is calculated under § 10(a) from his actual wages earned in the year prior to the injury. See 33 U.S.C. § 910(a), (d)(1); Universal Maritime Corp. v. Moore, 126 F.3d 256, 265 (4th Cir. 1997) (explaining calculation). While the exact amount of Wright's vacation and holiday pay earned as "wages" during this year (April 17, 1994, to April 16, 1995) can be determined from the local labor contract, the amount of the container royalty cannot be known until the size of the royalty fund and the number of royalty recipients is known. We agree with Universal Maritime that because the amount of Wright's actual wages cannot be determined at the time of his injury, the calculation of his average weekly wage under § 10(a) is not feasible.

27

see also Hall v. Consolidated Employment Sys., Inc. , 139 F.3d 1025, 1030-31 (5th Cir. 1998). The timing of the payments in this case warrants the application of § 10(c) in order to accurately and promptly calculate Wright's pre-injury average weekly wage. To do this, his pre-injury ability to earn vacation, holiday, and container royalty payments in a contract year must first be assessed. If Wright worked 700 or more hours in the 365 days immediately preceding his injury, it is reasonable to find that he possessed the capacity to earn payments from the funds. The amount of these payments must then be determined. The amount of vacation and holiday pay earned by Wright is specified by the local contract and thus can be exactly calculated. Similarly, the most recent container royalty payment can serve to reasonably approximate Wright's capacity to earn wages from the royalty.[18] In this way Wright's average weekly wages can be calculated to reasonably represent his pre-injury earning capacity so as not to delay his compensation. Therefore, while we agree with the company that the unusual timing of the container royalty payment complicates the calculation of the average weekly wage under § 10, we conclude that § 10(c) provides the solution to this difficulty.

Accordingly, we hold that vacation, holiday, and container royalty payments are "wages" under § 2(13) if they are earned through work but not if they are earned with disability credit. Because the record does not indicate whether Wright demonstrated the ability to earn these payments through hours actually worked in the year prior to his injury, this issue must be addressed on remand. [19]

_____

[18] Of course, if the actual amount of the appropriate container royalty is known, it should be used in calculating a claimant's average weekly wage. See Sproull v. Director, OWCP, 86 F.3d 895, 899 (9th Cir. 1996).
[19] We note that our holding is consistent with the position of the Director of Workers' Compensation Programs and the rulings of the Benefits Review Board that have interpreted § 2(13) after the 1984 amendment. See, e.g., Thomas Ring, 31 B.R.B.S. 212, 213 (1998) (per curiam) (noting that Department of Labor advised employer that container royalty and vacation/holiday pay is included in calculation of average weekly wages); Estate of George Trice, 30 B.R.B.S. 165, 167 (1996) (per curiam) (Board agrees with Director that container royalty is included in average weekly wage); John Lopez, 23 B.R.B.S. 295, 300-01 (1990) (per curiam) (container royalty is wage and not fringe benefit); Janet

28

IV.

Universal Maritime alternatively argues that if holiday, vacation, and container royalty payments are "wages" under § 2(13), then Wright's receipt of these payments during the period of his disability constitutes a post-injury "wage-earning capacity" that must be subtracted from his compensation under the Act. Cf. 33 U.S.C. § 908(e), (h). The company adds that unless these payments are included in his wage-earning capacity, Wright will receive an inequitable double recovery. In other words, Wright would receive statutory compensation calculated on the premise that his injury prevented him from earning vacation, holiday, and container royalty payments when, in reality, he never lost these wages and will still receive these payments in the future. This would effectively compensate Wright twice, resulting in a double recovery. While we conclude that these payments do not reflect a residual (post-injury) wage-earning capacity, we agree with the company that there is a potential for an inequitable double recovery that must be addressed on remand.

A.

Universal Maritime essentially argues that the economic effect of Wright's temporary disability did not render him "totally" disabled because, while disabled, he continued to receive wages in the form of vacation, holiday, and container royalty payments. We disagree.

This argument fails to distinguish between the receipt and the earning of wages. Section 8(h) provides that a claimant's post-injury "wage-earning capacity . . . shall be determined by his actual earnings if such actual earnings fairly and reasonably represent his wage-

_____

McMennamy, 21 B.R.B.S. 351, 354 (1988) (per curiam) (interpreting second sentence of § 2(13) which excludes "fringe benefits" from wages as being consistent with holding of Morrison-Knudsen); Bridget Denton, 21 B.R.B.S. 37, 46-47 (1988) (per curiam) (foreign posting allowances and cost of living supplements are not fringe benefits because their value was readily calculable). "Although not controlling, the consistent practice of the agencies charged with the enforcement and interpretation of the Act are entitled to deference." Morrison-Knudsen, 461 U.S. at 635.

29

earning capacity." Id. § 908(h). Whether wages are received during a period of disability is irrelevant to this inquiry. Instead, we must ask whether the claimant earned the wages while he was disabled. Universal Maritime "erroneously equates earning with receipt and obscures the distinction between wages and wage-earning capacity." Eagle Marine Servs. v. Director, OWCP, 115 F.3d 735, 737 (9th Cir. 1997) (receipt of holiday pay during disability does not reflect wage-earning capacity); see also SEACO v. Richardson , 136 F.3d 1290, 1291 n.3, 1293 (11th Cir. 1998) (per curiam) (same). If wages are earned before but received after an injury, they are only a "measure of pre-injury earning capacity, not of postinjury earning capacity." Eagle Marine, 115 F.3d at 737. Therefore, they cannot "`fairly and reasonably represent' a wage-earning capacity under§ 8(h)." Id.

It follows that if Wright earned the vacation, holiday, and container royalty payments before his injury but received them while he was disabled, the payments reflect only pre-injury earning capacity. Similarly, if he earned these payments while he was disabled because of hours credited for his disability, the payments are not "wages" because they were not paid for his "services." See supra at 24-25. One of these two situations must apply, and in both situations the vacation, holiday, and container royalty payments received while Wright was disabled do not reflect a post-injury wage-earning capacity. Accordingly, we hold that Wright did not have any wage-earning capacity during his disability.

B.

We recognize, however, that there is still a potential for a double recovery in this case. Although Universal Maritime is incorrect in suggesting that this results from an inaccurate determination of Wright's post-injury wage-earning capacity, an inappropriate calculation of Wright's pre-injury average weekly wages under § 10 could yield a double recovery.

Section 8 demonstrates that one of the Act's central purposes is to compensate workers who are injured on the job by providing disability compensation equal to two-thirds of the decrease in earning capacity that results from their injuries. See 33 U.S.C. § 908(a)-(c), (e); supra at 8. To do this, the Act looks to the period after the injury and

30

asks two questions. What would the worker have been able to earn if he was injury free and what will the worker earn given that he is, in fact, injured? Taking the difference between (1) a claimant's earning capacity after injury and (2) a projection of what his earning capacity would have been had the injury never occurred, the Act calculates the earning capacity lost after the date of injury. <u>Cf.</u> 33 U.S.C. § 908(c)(21), (e). Of course, both the injury-free and post-injury earning capacities for this (post-injury) period must be approximated, and this is done under §§ 10 and 8(h), respectively. Section 10 uses a claimant's "average weekly wages" <u>before</u> the injury (normally the year prior to the injury) to estimate the earning capacity that he would have had <u>after</u> the date of injury if he had been injury free. <u>Cf.</u> 33 U.S.C. § 910(a), (c), (d)(1). We refer to this as a claimant's pre-injury earning capacity because this was his capacity to earn future wages before the disabling injury. In other words, the Act looks to the past to project what might have been in the future (after the date of injury). Normally, this is a straightforward exercise, but the unusual manner in which vacation, holiday, and container royalty payments are earned adds a twist in this case.

Assuming that Wright worked 700 hours before the date of his injury (April 17, 1995) in the contract year in which he became disabled, he would have already become entitled to receive vacation, holiday, and container royalty payments as of April 17, 1995. Even if he failed to work a single hour between this date and the end of the 1994-1995 contract year (September 30, 1995), his 700 hours of work still would earn him the vacation, holiday, and container royalty payments for this period. Similarly, if Wright had been able to work an additional 700 hours between April 17 and September 30, 1995, he would not have received a penny more from the vacation, holiday, and container royalty funds. In other words, if (as we assume) Wright was already entitled to these payments before he was injured, he had no (pre-injury) capacity to earn any additional vacation, holiday, or container royalty pay from April 17 until the next contract year began on October 1, 1995. Should this be the case, the calculation of his pre-injury average weekly wages under § 10(c) on remand must exclude the value of these payments for the 1994-1995 contract year. This will ensure that Wright's average weekly wage will "reasonably represent" his pre-injury capacity to earn additional vacation, holiday, and container royalty pay from work. <u>Cf.</u> 33 U.S.C.§ 910(c). A contrary

31

result would unjustly award disability compensation for wages that could not have been earned or lost between April 17, 1995, and September 30, 1995.

However, under the assumption above, once the next contract year begins (October 1, 1995) Wright's average weekly wages must be readjusted to reflect his pre-injury ability to earn these payments for the (new) 1995-1996 contract year. If Wright had not been injured and had been able to work at the beginning of this year (October 1, 1995), he would have had the capacity to earn the 1995-1996 vacation, holiday, and container royalty payments as wages. Thus, even if Wright had no capacity to earn additional payments for the 1994-1995 contract year, he certainly had the pre-injury capacity to earn them for the following year. Accordingly, his statutory compensation from October 1, 1995, through the end of his disability must reflect this capability, if it can be demonstrated on remand.

These adjustments to Wright's average weekly wages under § 10(c) will accurately reflect his pre-injury ability to earn wages after April 17, 1995, and will mitigate against a double recovery under the Act.[20]

_____

[20] Although Wright may still receive vacation, holiday, and container royalty payments because of disability credit, his statutory compensation will not overcompensate him for his disability. Overcompensation results only when a worker is compensated for earning capacity that was not lost. When holiday, vacation, and container royalty payments are earned through disability credit and not work, however, they are not wages and the capacity to earn them as wages has been lost. The fact that employers provide supplemental disability coverage in the form of vacation, holiday, and container royalty payments does not affect the amount of the Act's statutory compensation. If the union and employers wish to supplement the LHWCA's compensation (which only replaces two-thirds of a worker's lost earning capacity), they may do so. Likewise, if the company wishes to eliminate these supplements in the future, it is free to attempt to negotiate a change in the next labor contract.

We recognize that, in some instances, hindsight will reveal that a claimant was slightly overcompensated. This can occur when a claimant recovers from a temporary, total disability in the middle of a contract year and is still able to work 700 hours before the year ends. Because he would earn vacation, holiday, and container royalty payments as "wages"

32

V.

In sum, we conclude that Wright's holiday, vacation, and container royalty earnings are "wages" under § 2(13) of the Act if they were earned through work. We also conclude that these payments do not reflect a residual (post-injury) wage-earning capacity even though they were received while Wright was disabled. The Board is therefore affirmed on these points. Nevertheless, Wright's compensation may be improperly inflated by including vacation, holiday, and container royalty payments in his pre-injury average weekly wage if they were already earned by the time of Wright's injury or if he did not demonstrate the pre-injury capacity to earn these payments through work. Because the stipulated facts do not disclose whether Wright's average weekly wages should have been calculated by including these amounts, we remand to the Board with instructions to remand to the ALJ for further development of the record and for a recalculation of Wright's benefits in a manner consistent with this opinion.

<u>AFFIRMED IN PART, VACATED</u>
<u>IN PART, AND REMANDED</u>

_____

with this work, the Act's original compensation award (which was calculated in part to reflect a pre-injury capacity to earn these payments as wages) would have included some compensation for payments that the claimant was nevertheless able to earn after his disability ended. Although the Act's approximation of the injury's economic effect is reasonable during the claimant's disability, hindsight may reveal that this approximation was not exact. The Act, however, does not require that we perform the impossible task of determining a claimant's pre-injury earning capacity with absolute precision. Section 10(c) simply requires that a claimant's average weekly wages "reasonably represent" his pre-injury earning capacity. <u>See</u> 33 U.S.C. § 910(c), (d)(1). While the luxury of hindsight might make a determination of this capacity more accurate, waiting until the end of a disability clearly conflicts with the Act's general policy of "encourag[ing] the prompt and efficient administration of compensation claims," <u>Rodriguez v. Compass Shipping Co.</u>, 451 U.S. 596, 612 (1981); <u>cf. also Morrison-Knudsen</u>, 461 U.S. at 636-37. In any event, we believe that if any overcompensation does occur, it will occur infrequently and the amount will be limited.

33