627 A.2d 86

**Frank BARNETT**

v.

**SARA LEE CORPORATION, et al.**

**No. 1692, Sept. Term, 1992.**

Court of Special Appeals of Maryland.

July 8, 1993.

Certiorari Denied Nov. 19, 1993.

Harold R. Weisbaum (Blum & Weisbaum, on the brief), Baltimore, for appellant.

George W. Elder (Law Office of Joseph Jagielski, Baltimore, on the brief), for appellees, Sara Lee and Standard Fire Ins. Co.

Heather H. Kraus (Rudolph L. Rose, Severn E.S. Miller and Semmes, Bowen & Semmes, Baltimore, on the brief), for appellees, Sara Lee and Travelers Indemn. Co. of Illinois.

Argued before ALPERT, WENNER and LERNER (Eugene M., Specially Assigned), JJ.

LERNER, Judge.

The primary issue in this appeal is whether pension benefits constitute wages within the purview of the Maryland Workers' Compensation Statute. Claimant/appellant Frank Barnett ap-

pealed from the decision of Judge Richard T. Rombro of the Circuit Court for Baltimore City affirming the awards issued by the Workers' Compensation Commission (hereinafter, the "Commission") on January 7, 1992 to him. At issue are certain workers' compensation provisions of the Md. Labor & Employment article (1991 Repl.Vol.) (hereinafter, "LE,")[1] which set out the scope of permissible evidence in "other [permanent partial disability] cases."

Appellant has worked as a truck driver through the Truck Drivers and Helpers Local Union No. 355 since May 19, 1962. In 1975, appellant injured his *left* arm, for which he received an award from the Commission for a 25% permanent, partial impairment. In March, 1987, while working for appellee Sara Lee Corporation, appellant slipped while pushing a loaded food cart, reinjuring and hyperextending his left arm and tearing his left rotator cuff. In December, 1987, appellant slipped while getting out of his truck, tearing his *right* rotator cuff. Appellant filed for workers' compensation benefits in both instances. Following the surgery on the right rotator cuff, the treating physicians determined that appellant should not return to his job as a truck driver. Consequently, after his rehabilitation from his injuries, appellant was rehired by Sara Lee to work in a *non-union* clerical position coordinating deliveries. The record reflects that the non-union position paid slightly less than appellant's prior job but, more significantly, the employer contribution to appellant's pension plan was substantially lower due to the fact that the new job was non-union.

---

1. LE § 9–627 provides in pertinent part as follows:

   (k) *Other Cases*—(1) In all cases of permanent partial disability not listed in subsections (a) through (j) of this section, the Commission shall determine the percentage by which the industrial use of the employee's body was impaired as a result of the accidental injury or occupational disease.

   (2) In making a determination under paragraph (1) of this subsection, the Commissioner shall consider factors including:

   (i) the nature of the physical disability; and

   (ii) the age, experience, occupation, and training of the disabled covered employee when the accidental personal injury or occupational disease occurred.

On December 26, 1992, a hearing was held before the Commission. During the course of the hearing, appellant's attorney attempted to elicit testimony from appellant regarding loss of future pension benefits as a result of his termination from the union job. Upon Sara Lee's timely objection to appellant's proffered testimony regarding the pension contributions, the Commissioner excluded the evidence, explaining:

> But that's not earnings. That's not his ability to do his job. Yes, it has a financial impact on him, I agree. But that's not the standard that we use at the Commission.... It's not his earning power.... [M]y ruling is one based on the law, and I don't think that is something I would include in industrial loss.

Following the hearing, the Commission passed two Awards of Compensation on January 7, 1992, and thereby awarded appellant 70% permanent partial disability: 30% due to the right shoulder injury of December, 1987, for which appellee Travelers Indemnity Company of Illinois was the insurer; 35% for the March, 1987, injury to the left shoulder for which appellee Standard Fire Insurance Company was the insurer; and 5% reflecting appellant's prior injury to his left arm. On January 28, 1992, the Commission denied appellant's Motion for Reconsideration.

On February 10, 1992, appellant noted timely appeals in each case to the Circuit Court for Baltimore City, asking that court (1) to find that the Commissioner erred when it excluded the evidence of future pension benefits, and (2) to remand the cases for further hearings. Appellant simultaneously filed Motions for Summary Judgment with the circuit court, asking it to remand the case to the Commissioner with instructions to take additional testimony regarding the pension benefits. Appellant also requested that court to reconsider, in light of the additional testimony, the Commissioner's decision regarding the extent of appellant's industrial loss of use.

After hearing argument from all parties to the two companion cases, the trial court consolidated them and, in June, 1992,

issued a Memorandum Opinion and Order (1) denying appellant's Motion for Summary Judgment, and (2) entering summary judgment in favor of Sara Lee and its insurers. Judge Rombro held that the Commission properly refused to hear evidence on alleged lost future pension benefits in determining the percentage of industrial loss of use resulting from the two accidental injuries. Appellant then appealed to this Court, and, in so doing, asked us to consider the following four questions:

1. Did appellant note a timely and proper appeal from the Commission's decision awarding benefits for permanent partial disability?

2. Did the circuit court err when it affirmed the Commission's ruling that pension benefits are not considered wages under workers' compensation law, and thus are inadmissible to determine appellant's "industrial loss of use"?

3. Even if pension benefits are not considered wages under workers' compensation law, are they still evidence of loss of earning capacity admissible to show appellant's "industrial use of loss"?

4. Does the Federal Employment Retirement and Income Security Act (ERISA) pre-empt state law and preclude consideration of pension benefits within the amount received under workers' compensation law?

## THE APPEAL

As a preliminary matter, appellees raise two issues as to the form of appellant's Appeal Petitions: (1) that Barnett appealed only the Commission's denial of a Motion for Reconsideration, and did not allege an abuse of discretion by the Commission; and (2) that Barnett failed to allege any error by the Commission with respect to the award, and thus he failed to appeal the Commission's final order.

Appellant's Petition states, in pertinent part, as follows:

1. That on January 10, 1992, the Workers' Compensation Commission of Maryland passed an Order refusing to reconsider the decision not to consider evidence of Mr.

Barnett's loss of retirement income as a result of his accidental injury on March 19, 1987.

2. That the Commission misconstrued the law and the facts applicable to the case.

3. That Mr. Barnett's loss of retirement income should have been considered, contrary to the findings of the Commission.

Although it is true that appellant's Petition does not explicitly refer to the final award made by the Commission, it is unfounded to suggest, as the appellees do, that this is merely an interlocutory appeal from an evidentiary ruling. In the Appeal Order to the circuit court, appellant references both (1) the January 28, 1992 decision denying reconsideration, and (2) the January 7, 1992 order, in which the actual awards were made. Clearly, a final award had already been made when the appeal was noted. There is nothing of an interlocutory nature about appellant's appeal. *See B & K Rentals v. Universal Leaf,* 319 Md. 127, 133–34, 571 A.2d 1213 (1990) (The Maryland Rules do not require notice of appeal to designate the order or judgment from which appeal is taken).

Moreover, we hold that appellant has implicitly alleged an abuse of discretion by the Commission; *i.e.,* appellant contends "[t]hat Mr. Barnett's loss of retirement income should have been considered, contrary to the findings of the Commission." In addition, we believe that appellees have suffered no prejudice because of appellant's appeal petition, and the irregularities, if any, are mere technicalities that do not provide sufficient basis for depriving Barnett of his legal rights. *Francois v. Alberti Van & Storage Co.,* 285 Md. 663, 667–68, 404 A.2d 1058 (1979); *Border v. Grooms,* 267 Md. 100, 106–07, 297 A.2d 81 (1972).

## *SUMMARY JUDGMENT*

Although appellant properly appealed to the circuit court the awards made by the Commission, the case actually comes to us from the entry of summary judgment against him issued by Judge Rombro. Summary judgment is properly entered

when there is no genuine dispute as to any material fact and the party is entitled to judgment as a matter of law. Md.Rule 2–501(a). The standard for appellate review of a trial court's grant of summary judgment is whether the trial court was legally correct, since a trial court decides issues of law, not fact, when granting summary judgment. *Heat & Power Corp. v. Air Prods. & Chems.*, 320 Md. 584, 590–92, 578 A.2d 1202 (1990)., For reasons which we will discuss below, we hold that the trial court did not commit an error of law when it granted appellee's Motion for Summary Judgment.

## *THE PENSION BENEFITS*

Although appellant urges us to consider the question of the admissibility of pension benefits in the separate contexts of wages and loss of earning capacity, we will address them together as we feel neither context provides grounds in which to allow such evidence. As we have said in *Hall v. Willard Sand & Gravel Co.*, 60 Md.App. 260, 482 A.2d 159 (1984), a trier of fact may take into account the amount of *wages* the claimant earned before and after the injury in order to determine *loss of earning capacity* in "industrial loss of use" cases. *Id.* at 268, 482 A.2d 159. Thus, the issues of wages and earning capacity are, at least in the present context, inextricably bound together. Appellant asserts that *Hall* implied that there are other earnings, aside from wages, that can be used to show loss of earning power. We disagree. In *Hall*, we reversed a trial court's decision to exclude evidence of claimant's pre-injury wages in a workers' compensation claim. In doing so, we discussed the issue of admissible evidence in industrial loss cases:

> By excluding a comparison of wages at the time of the accident and post-injury wages, the jury was required to decide the amount of permanent partial disability to be dependant almost exclusively on the showing of the anatomical loss. In light of Art. 101, § 36(4) of the Maryland Code and the holding in [*Bethlehem–Sparrows Point Shipyard v. Damasiewicz*, 187 Md. 474, 50 A.2d 799 (1947) ], this is, we

conclude, too narrow a basis for the determination of industrial loss.

*Id.* 60 Md.App. at 266, 482 A.2d 159. Our treatment of loss of earning capacity in *Hall* was clearly confined to a determination of "wages." The issue *sub judice* is whether fringe benefits, such as employer contributions to pension plans, are to be considered wages under applicable workers' compensation law. In this regard, LE § 9–602 defines average weekly wage as follows:

*Computation—In general.—*

(1) Except as otherwise provided in this section, the average weekly wage of a covered employee shall be computed by determining the average of the weekly wages of the covered employee:

(i) when the covered employee is working on full time; and

(ii) at the time of:

1. the accidental personal injury; or

2. the last injurious exposure of the covered employee to the hazards of an occupational disease.

(2) For purposes of a computation under paragraph (1) of this subsection, wages shall include:

(i) tips; and

(ii) the reasonable value of housing, lodging, meals, rent, *and other similar advantage* that the covered employee received from the employer.

LE § 9–602(a) (emphasis added). Appellant specifically urges this court to interpret the phrase "similar advantage" to include fringe benefits so as to bring them under the penumbra, if not the definition of, "wages." Although Maryland courts have not faced this issue before, the United States Supreme Court, in *Morrison–Knudsen Construction Company v. Director, OWCP,* 461 U.S. 624, 103 S.Ct. 2045, 76 L.Ed.2d 194 (1983), resolved a similar appeal from a federal administrative law judge's decision to exclude fringe benefits from the definition of wages under the District of Columbia

workers' compensation statute. The District of Columbia statute, which incorporated the provisions of the federal Longshoremen's and Harbor Workers' Compensation Act (LHWCA) (33 U.S.C. §§ 901 *et seq.*), defined wages as follows:

"Wages" means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer[.]

D.C.Code Ann. § 36–301(19) (1981).

Writing for the majority in *Morrison–Knudsen,* Chief Justice Burger concluded that fringe benefits could *not* be considered wages under the statute's definition, as (1) they are not a similar advantage to board, rent, housing, or lodging in that they are not benefits with a present value that is easily converted into a cash equivalent, and, rather, they essentially constitute a speculative interest, 461 U.S. at 630–32, 103 S.Ct. at 2048–50; (2) the legislative history of the LHWCA, its structure, and the agency enforcement, show that Congress did not intend to include employer contributions to union trust funds within the definition of wages, *id.* at 632–35, 103 S.Ct. at 2049–51; and (3) to extend the meaning of the term "wages" under the LHWCA to include fringe benefits, even if supported by recent employment trends, would significantly alter the balance between the concerns of the longshoremen and their employers, potentially disrupting the LHWCA's ability to ensure prompt compensation. *Id.* at 635–37, 103 S.Ct. at 2049–51.

We believe Maryland law to be substantively similar to that of the District of Columbia. Although, as appellant points out in his brief, Maryland lacks the legislative history that Justice Burger found underlying the District of Columbia statute, the definition of "wages" is almost identical in both the Maryland and D.C. statutes. Had it so intended, the Maryland legislature could have specified fringe benefits such as pension contributions within the "wages" definition. As it is, the General Assembly has merely specified a few housing-in-kind

benefits, as well as other "similar advantage[s]," which "advantage[s]" appellant asserts include fringe benefits. In the absence of more explicit language, however, we hold that the interpretation of the phrase "similar advantage" does not include such benefits. Professor Larson's discussion of fringe benefits in this context is persuasive:

> Workers' compensation has been in force in the United States for over seventy years, and fringe benefits have been a common feature of American industrial life for most of that period. Millions of compensation benefits have been paid during this time. Whether paid voluntarily or in contested and adjudicated cases, they have always begun with a wage base calculation that made "wage" mean the "wages" that the worker lives on and not miscellaneous "values" that may or may not some day have a value to him depending on a number of uncontrollable contingencies.

A. Larson, *The Law of Workers' Compensation,* Volume 2, § 60.12(b) (1993).

Moreover, as Chief Justice Burger found in the context of the LHWCA, the administrative difficulties that would result if such evidence were allowed would be prohibitive. Judge Rombro succinctly stated this problem when he denied Barnett's Motion for Summary Judgment:

> Every pension plan is different, and the Commission would be required in practically every case to have the testimony of actuaries with regard to vesting, the amounts that would be due and the present values among other factors. This would be totally unacceptable....

Although the record does not reflect it, appellant claims that his pension benefits had vested at the time of the injuries, and thus this evidence can easily be calculated into his loss of wages or earning capacity. The mere fact of vesting, however, does not eliminate other uncertainties that would result in these cases, such as present value calculations, and the possible disruption of the claims process. Nor are we persuaded in any event to distinguish between vested and non-vested bene-

fits because neither is the result of specified wages that can be tied to work performance.

Appellant cites a number of cases from other jurisdictions that have held that evidence of fringe benefits is admissible to determine a claimant's wage. Many of these cases come from jurisdictions whose workers' compensation statutes define wages in a materially different manner than Maryland's. *See Ashby v. Rust Engineering Co.,* 559 A.2d 774, 774 (Me.1989); *Ex parte Murray,* 490 So.2d 1238, 1240–41 (Ala.1986) (employer-paid fringe benefits which were not provided gratuitously . . . constituted "allowances of any character" weekly wage); *Ragland v. Morrison–Knudsen Co., Inc.,* 724 P.2d 519, 522–23 (Ak.1986) (fringe benefits are better analyzed as part of "the money rate" at which an employee is paid). Given the statute at hand and Chief Justice Burger's interpretation of the District's comparable workers' compensation statute, we hold that evidence of fringe benefits is not admissible to show a claimant's industrial loss of use.

### *ERISA PRE–EMPTION*

We need not reach this issue posed by appellees as we hold that the trial court did not commit an error of law in granting the summary judgment for the reasons stated above.

JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. APPELLANT TO PAY THE COSTS.