CURRY SHAW, Employee, Plaintiff v. U.S. AIRWAYS, INC., Employer, AMERICAN
PROTECTION INSURANCE COMPANY, Carrier, Defendants

No. COA06-1407

(Filed 6 November 2007)

**Workers' Compensation— average weekly wage—employer-funded retirement accounts**

An Industrial Commission conclusion in a workers' compensation case that employer-funded contributions to plaintiff's two retirement accounts should not be included in the calculation of plaintiff's average weekly wage was reversed and remanded. Not all fringe benefits are required to be excluded from an average weekly wage calculation; moreover, the Commission did not apply the proper analysis in determining whether the contributions at issue in this case should be excluded.

Judge HUNTER dissenting.

Appeal by plaintiff from opinion and award entered 13 September 2006 by the North Carolina Industrial Commission. Heard in the Court of Appeals 9 May 2007.

*The Sumwalt Law Firm, by Vernon Sumwalt and Mark T. Sumwalt, for plaintiff-appellant.*

*Littler Mendelson P.C., by Kimberly A. Zabroski, for defendants-appellees.*

GEER, Judge.

Plaintiff Curry Shaw appeals from an opinion and award of the North Carolina Industrial Commission in which the Commission concluded that employer-funded contributions to plaintiff's two retirement accounts should not be included in the calculation of plaintiff's "average weekly wage," a term defined under N.C. Gen. Stat. § 97-2(5) (2005). Whether retirement contributions ought to be considered as part of an injured worker's average weekly wage is a question not previously considered by the North Carolina appellate courts. Because we have concluded that not all fringe benefits are required to be excluded from an average weekly wage calculation and because the Commission did not apply the proper analysis in determining whether the contributions at issue in this case should be excluded, we reverse and remand the matter to the Commission so that it may undertake the proper inquiry.

Contrary to the suggestion in the dissenting opinion, nothing in this opinion holds that the benefits at issue in this case should be included in calculating plaintiff's average weekly wage. We leave that question for the Commission to decide after applying the test mandated by *Kirk v. N.C. Dep't of Corr.*, 121 N.C. App. 129, 465 S.E.2d 301 (1995), *disc. review improvidently allowed*, 344 N.C. 624, 476 S.E.2d 105 (1996), and *Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs*, 461 U.S. 624, 76 L. Ed. 2d 194, 103 S. Ct. 2045 (1983).

## Facts

Plaintiff, a fleet service worker for defendant-employer U.S. Airways, suffered a compensable back injury on 12 July 2000 while attempting to lift a piece of heavy luggage from a baggage belt. Following the injury, plaintiff had a disc laminectomy and a fusion with hardware implantation. Because of his injury-related pain, plaintiff has received nerve root injections, undergone radiofrequency nerve obliteration procedures, and taken medication. At the time of the hearing before the deputy commissioner on 25 May 2005, plaintiff was still receiving temporary total disability due to the 12 July 2000 injury.

The terms of plaintiff's employment were set out in the "1999 Agreement Between U.S. Airways, Inc. and The International Association of Machinists and Aerospace Workers" (the "Agreement"). Under the Agreement, plaintiff was entitled to participate in two separate retirement programs: an "Employee Savings Plan" and an "Employee Pension Plan."

The Savings Plan is a 401(k) plan that allows employees to defer a certain percentage of their eligible income for retirement. Defendant-employer, in turn, will match 50% of the employee's personal contribution, up to 4% of the employee's eligible income, and will deposit the "matching" sum into the employee's savings account. In other words, the amount that defendant-employer is obligated to deposit into the savings account could vary between 0% and 2% depending on whether and how much the employee personally contributed.

The Pension Plan, unlike the Savings Plan, is funded entirely by contributions from defendant-employer. Because fleet service workers such as plaintiff are eligible for the Pension Plan, defendant-employer automatically made the obligatory contributions into plain-

tiff's pension account. The amount contributed to each employee's account is calculated based on the employee's income and age.

Despite their differences, the Savings and Pension Plans have some common features. Fidelity Investment Services administers the accounts in each plan. Fidelity offers a mix of pre-selected investment options, including mutual funds, stocks, and bonds, in which the employees can invest their personal contributions as well as defendant-employer's contributions. Although the investment options available to employees are the same under both the Savings and the Pension Plan, Fidelity maintains the accounts for each plan separately.

Shortly after plaintiff's injury, defendants filed a Form 22 that reported plaintiff's average weekly wage as $825.55, a sum omitting defendant-employer's contributions to plaintiff's Savings Plan account and to plaintiff's Pension Plan account. In the 52 weeks preceding plaintiff's injury, defendant-employer had contributed $1,798.33 to plaintiff's Pension Plan account and an additional $899.17 to plaintiff's Savings Plan account. Inclusion of these contributions would have increased plaintiff's average weekly wage by $51.87 or the total amount of defendant-employer's retirement contributions divided by 52.

On 23 November 2004, plaintiff requested a hearing because the parties were unable to agree on whether defendant-employer's retirement contributions were part of his average weekly wage. Following a 25 May 2005 hearing, Deputy Commissioner Phillip A. Holmes entered an opinion and award concluding that defendant-employer's contributions to the retirement accounts should not be included in the calculation of plaintiff's average weekly wage.

Plaintiff appealed to the Full Commission, which entered an opinion and award agreeing with the deputy commissioner. The Commission held that the retirement contributions represented a "fringe benefit . . . that should not be included in the calculation of [plaintiff's] average weekly wage" and further determined that "[p]laintiff's correct average weekly wage is $825.55," the amount originally reported by defendants. Plaintiff timely appealed to this Court from the Commission's opinion and award.

## Discussion

The only question arising in this appeal is whether defendant-employer's contributions to plaintiff's two retirement accounts

**SHAW v. U.S. AIRWAYS, INC.**

[186 N.C. App. 474 (2007)]

(Savings and Pension) should be included in his "average weekly wage." The calculation of an injured worker's compensation under our Workers' Compensation Act is based on his or her "average weekly wage" as defined by N.C. Gen. Stat. § 97-2(5).[1]

N.C. Gen. Stat. § 97-2(5) "sets forth in priority sequence five methods by which an injured employee's average weekly wages are to be computed, and in its opening lines, this statute defines or states the meaning of 'average weekly wages.' " *McAninch v. Buncombe County Sch.*, 347 N.C. 126, 129, 489 S.E.2d 375, 377 (1997). In this case, plaintiff argues that defendant-employer's retirement contributions should be included when calculating his average weekly wage pursuant to the first method. Under the first method, " '[a]verage weekly wages' shall mean the earnings of the injured employee in the employment in which he was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury . . . divided by 52." N.C. Gen. Stat. § 97-2(5). *See also McAninch*, 347 N.C. at 129, 489 S.E.2d at 377 (noting "the primary method, set forth in the first sentence, is to calculate the total wages of the employee for the fifty-two weeks of the year prior to the date of injury and to divide that sum by fifty-two").

While the word "earnings" appears to be the key concept in defining "average weekly wage," the Workers' Compensation Act does not specify what is, or what is not, encompassed within the term "earnings." Our task is to determine whether the legislature intended to exclude from "earnings" defendant-employer's contributions to plaintiff's retirement accounts. *Morris v. Laughlin Chevrolet Co.*, 217 N.C. 428, 430, 8 S.E.2d 484, 485 (1940) (" 'The object of all interpretation of statutes is to ascertain the meaning and intention of the Legislature, and to enforce it.' " (quoting *Kearney v. Vann*, 154 N.C. 311, 315, 70 S.E. 747, 749 (1911))).

Unlike other jurisdictions, North Carolina has not, in its Workers' Compensation Act, chosen to expressly exclude fringe benefits from an average weekly wage calculation. *See, e.g.*, 76 Del. Laws ch. 1, § 5 (2007) (amending Del. Code Ann. tit. 19, § 2302) (" 'Average weekly wage' means the weekly wage earned by the employee at the time of the employee's injury at the job in which the employee was injured, including overtime pay, gratuities and regularly paid bonuses . . . but

---

1. Curiously, defendants, in their brief, only defend the Commission's decision with respect to the exclusion of the Savings Plan matching contributions, even though plaintiff has challenged the omission of contributions to both the Savings and Pension Plan accounts.

excluding all fringe or other in-kind employment benefits."); N.M. Stat. Ann. § 52-1-20 (2003) (" 'average weekly wage' means the weekly wage earned by the worker at the time of the worker's injury, including overtime pay and gratuities but excluding all fringe or other employment benefits and bonuses"); 77 Pa. Stat. Ann. § 582 (2001) ("The terms 'average weekly wage' and 'total wages,' . . . [shall not] include fringe benefits, including, but not limited to, employer payments for or contributions to a retirement, pension, health and welfare, life insurance, social security or any other plan for the benefit of the employee or his dependents . . . ."). The United States Congress has also excluded fringe benefits for purposes of calculating compensation under the federal Longshore and Harbor Workers' Compensation Act. *See* 33 U.S.C. § 902(13) (2000) ("The term wages does not include fringe benefits, including (but not limited to) employer payments for or contributions to a retirement, pension, health and welfare, life insurance, training, social security or other employee or dependent benefit plan . . . .").

Although our General Assembly did not expressly address fringe benefits in the Workers' Compensation Act, it did so in the Employment Security Act. The Employment Security Act specifically excludes many fringe benefits from the definition of "wages" set out in that Act: "The term 'wages' shall not include the amount of any payment with respect to services to, or on behalf of, an individual in its employ under a plan or system established by an employing unit . . . on account of (i) retirement, or (ii) sickness or accident disability, or (iii) medical and hospitalization expenses in connection with sickness or accident disability or (iv) death." N.C. Gen. Stat. § 96-8(13)(a) (2005). *See also* N.C. Gen. Stat. § 96-8(13)(b) (excluding other employee benefits from definition of "wages" under Employment Security Act). The Employment Security Act demonstrates that the General Assembly knows that employee benefits are an issue with respect to the concept of wages and knows how to specifically exclude them from a definition of wages when it intends to do so. We, therefore, cannot, with respect to the Workers' Compensation Act, simply presume the General Assembly intended to exclude all fringe benefits from the term "earnings." *See Deese v. Southeastern Lawn & Tree Expert Co.*, 306 N.C. 275, 278, 293 S.E.2d 140, 143 (1982) ("[I]t is not reasonable to assume that the legislature would leave an important matter regarding the administration of the [Workers' Compensation] Act open to inference or speculation; consequently, the judiciary should avoid 'ingrafting upon a law something that has been omitted, which [it] believes ought to have been embraced.' "

(quoting *Shealy v. Associated Transport, Inc.*, 252 N.C. 738, 741, 114 S.E.2d 702, 705 (1960))).

Indeed, the statute itself indicates that at least some fringe benefits may be encompassed within the average weekly wage calculation. The statute provides that: "Wherever allowances of any character made to an employee in lieu of wages are specified part of the wage contract, they shall be deemed a part of his earnings." N.C. Gen. Stat. § 97-2(5).[2]

The principal North Carolina case to consider whether an employer-funded fringe benefit should be included within an average weekly wage calculation is *Kirk v. N.C. Dep't of Corr.*, 121 N.C. App. 129, 465 S.E.2d 301 (1995), *disc. review improvidently allowed*, 344 N.C. 624, 476 S.E.2d 105 (1996). In *Kirk*, the plaintiff— the next of kin of a deceased state worker—sought to include the State's contributions to the employee's health insurance in the computation of the average weekly wage. While this Court concluded that the health insurance contributions should not be included when calculating the employee's average weekly wage, nothing in *Kirk* suggests that all fringe benefits should be excluded from the average weekly wage computation.

Accordingly, neither the statute nor this Court's prior opinions supports the Full Commission's conclusion that defendant-employer's contributions to the two plans should not be included within the average weekly wage calculation simply because they constituted fringe benefits. The question whether N.C. Gen. Stat. § 97-2(5) encompasses retirement contributions such as those in this case is one of first impression. Other jurisdictions have considered the question and reached conflicting conclusions. *See Seagraves v. Austin Co. of Greensboro*, 123 N.C. App. 228, 230, 472 S.E.2d 397, 399 (1996) (consulting foreign case law to address question of first impression under North Carolina Workers' Compensation Act); *South Carolina Ins. Co. v. Smith*, 67 N.C. App. 632, 634, 313 S.E.2d 856, 858 ("As the particular question before us has never been confronted by the courts of this State, in addition to reviewing pertinent North Carolina authority, we

2. In its first conclusion of law, the Commission noted that plaintiff presented no evidence and did not argue that the Savings and Pension Plan contributions were allowances "in lieu of wages." Plaintiff also did not include any assignment of error on appeal purporting to argue that defendant-employer's contributions were allowances in lieu of wages. Accordingly, we have no occasion in this case to consider whether the contributions might qualify as such allowances. *Cf. Greene v. Conlon Constr. Co.*, 184 N.C. App. 364, 366, 646 S.E.2d 652, 655 (2007) (holding that weekly payment of $320.00 to employee for meals and lodging was an allowance in lieu of wages).

have examined cases from other jurisdictions . . . ."), *disc. review denied*, 311 N.C. 306, 317 S.E.2d 682 (1984).

The leading treatise on workers' compensation law makes the following general observation: "In computing actual earnings as the beginning point of wage-basis calculations, there should be included not only wages and salary but *any thing of value received as consideration for the work*, as, for example, tips, bonuses, commissions and room and board, *constituting real economic gain to the employee*." 5 Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law* § 93.01[2][a], at 93-19 (2005) (emphasis added). Nonetheless, many jurisdictions have held that pension or retirement plan contributions do not belong to the category of valuable "things" that form the basis of wages for purposes of calculating workers' compensation benefits. *See, e.g., Luce v. United Techs. Corp.*, 247 Conn. 126, 133-41, 717 A.2d 747, 752-55 (1998) (construing Connecticut's "average weekly wage" definition to exclude insurance and pension benefits); *Barnett v. Sara Lee Corp.*, 97 Md. App. 140, 148, 627 A.2d 86, 90-91 (holding that "average weekly wage" does not include pension contributions and noting that "[h]ad it so intended, the Maryland legislature could have specified fringe benefits such as pension contributions within the 'wages' definition"), *cert. denied*, 332 Md. 702, 632 A.2d 1207 (1993); *Antillon v. N.M. State Highway Dep't*, 113 N.M. 2, 5-6, 820 P.2d 436, 440 (1991) (holding that contributions to state retirement plan "are not within the definition of 'wages' " under New Mexico's workers' compensation scheme).

The leading case espousing the view that the value of "fringe benefits," such as employer-funded pension or insurance benefits, should not be factored into wage calculations is the United States Supreme Court's decision in *Morrison-Knudsen Constr. Co. v. Dir., Office of Workers' Comp. Programs*, 461 U.S. 624, 76 L. Ed. 2d 194, 103 S. Ct. 2045 (1983). In that case, the Supreme Court held that employer contributions to union trust funds for health and welfare, pensions, and training were not encompassed by the then-existing definition of "wages" in the Longshore and Harbor Workers' Compensation Act, 33 U.S.C. § 902(13). *Id.* at 629-30, 76 L. Ed. 2d at 199, 103 S. Ct. at 2048-49.

The statute defined "wages" as " 'the money rate at which the service rendered is recompensed . . . including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer . . . .' " *Id.* at 629, 76 L. Ed. 2d at 199, 103 S. Ct. at 2048 (quoting 33 U.S.C. § 902(13)). Thus, the "narrow question" before the

SHAW v. U.S. AIRWAYS, INC.

[186 N.C. App. 474 (2007)]

Court was whether such employer "contributions are a 'similar advantage' to 'board, rent, housing, [or] lodging.' " *Id.* at 630, 76 L. Ed. 2d at 199, 103 S. Ct. at 2048 (alteration original). Although the Court reviewed relevant legislative history as well as statutory structure and underlying policy goals, the Court primarily decided as a matter of plain meaning that the employer contributions to the union trust funds were not "wages" because, unlike board or lodging, these contributions did not have a "present value . . . readily convert[ible] into a cash equivalent." *Id.*, 103 S. Ct. at 2049.

According to *Larson's*, "[t]he Supreme Court's examination of the 'wages' definition within the Longshore Act represents the majority position on the treatment of fringe benefits." *Larson's*, § 93.01[2][b], at 93-22. *Larson's* itself generally agrees with the *Morrison-Knudsen* ruling and cautions against judicial interpretation of the concept of "wages" to indiscriminately include fringe benefits:

> Workers' compensation has been in force in the United States for over eighty years, and fringe benefits have been a common feature of American industrial life for most of that period. Millions of compensation benefits have been paid during this time. Whether paid voluntarily or in contested and adjudicated cases, they have always begun with a wage basis calculation that made "wage" mean the "wages" that the worker lives on and not miscellaneous "values" that may or may not someday have a value to him or her depending on a number of uncontrollable contingencies. Before a single court takes it on itself to say, "We now tell you that, although you didn't know it, you have all been wrongly calculating wage basis in these millions of cases, and so now, after eighty years, we are pleased to announce that we have discovered the true meaning of 'wage' that somehow eluded the rest of you for eight decades," that court would do well to undertake a much more penetrating analysis than is visible in the [D.C.] Circuit Court's opinion in [*Morrison-Knudsen*] [i.e., the opinion reversed by the Supreme Court] of why this revelation was denied to everyone else for so long.

*Id.*, § 93.01[2][b], at 93-21 to -22.

Contrary to the majority view, some jurisdictions have held that fringe benefits should be included when calculating the amount of the workers' compensation benefit, at least where the worker's right to such benefits is vested or where the amount of benefits was based on the units of time worked. *See Ragland v. Morrison-Knudsen Co.*, 724

P.2d 519, 520 (Alaska 1986) (holding "that the readily identifiable and calculable value of fringe benefits," in which worker was indisputably vested and which were the product of a collective bargaining agreement, "should be included in the wage determination"); *Ashby v. Rust Eng'g Co.*, 559 A.2d 774, 774-76 (Me. 1989) (where collective bargaining agreement committed employer to pay a certain amount "to various union-established funds for employee health benefits, pension benefits, etc.," and where such payments were based on "unit of employee time worked," court held that "such payments fall under the definition of 'average weekly wages, earnings or salary' for purposes of calculating compensation benefits"), *superceded by statute as stated in Hincks v. Robert Mitchell Co.*, 1999 ME 172, § 9, 740 A.2d 992, 995 (1999) ("shortly after our decision in *Ashby*, the Legislature enacted P.L. 1991, ch. 615, § A-20, providing that fringe benefits may not be included in an employee's average weekly wage").

We do not consider this issue on an entirely blank slate. This Court in *Kirk*, although not bound by *Morrison-Knudsen* in construing the North Carolina Workers' Compensation Act, found the United States Supreme Court's analysis relevant to the determination whether it would be "unfair" to exclude Kirk's health insurance benefits from the calculation of his average weekly wage. More specifically, the *Kirk* Court relied on the "reasoning" in *Morrison-Knudsen* "that wage means 'the money rate at which service is recompensed under the contract of hiring' and not 'fringe benefits that cannot be converted into a cash equivalent.' " *Kirk*, 121 N.C. App. at 136, 465 S.E.2d at 306 (quoting *Morrison-Knudsen*, 461 U.S. at 629, 76 L. Ed. 2d at 199, 103 S. Ct. at 2048). Applying this reasoning, *Kirk* held:

> A State employee receives the benefits of the State Health Plan only when needed. The value of this benefit cannot be quantified. After carefully considering the evidence, we cannot say that the Commission's failure to include such allowance produced an unfair result for the plaintiff. Thus, absent a finding that method two produces an unfair result, the Commission did not err by excluding the State's contributions to Kirk's Health Plan in the calculation of Kirk's average weekly wages.

*Id.*

In *Kirk*, the plaintiff did not argue that the health insurance contributions were "earnings" under N.C. Gen. Stat. § 97-2(5), as plaintiff has in this case. Rather, the plaintiff in *Kirk* contended that these con-

SHAW v. U.S. AIRWAYS, INC.

[186 N.C. App. 474 (2007)]

tributions should be included pursuant to the "fourth method" for computing average weekly wage under § 97-2(5), arguing that it would be "unfair" to exclude them. *Id.* at 135, 465 S.E.2d at 305. The "fourth method," which explicitly incorporates a "fairness" component, provides: "where for exceptional reasons the foregoing [methods] would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury." N.C. Gen. Stat. § 97-2(5).[3]

While *Kirk* did not directly analyze the term "earnings" as used within N.C. Gen. Stat. § 97-2(5), the decision may be fairly read as holding that the State-provided health insurance contributions were not "earnings" because they were " 'fringe benefits that cannot be converted into a cash equivalent.' " *Kirk*, 121 N.C. at 135, 465 S.E.2d at 305. Under *Kirk*, therefore, employee benefits must be considered on a case-by-case basis to determine whether they can be converted into a cash equivalent. If so, such benefits may be considered as part of the worker's average weekly wage.

Neither *Kirk* nor *Morrison-Knudsen* elaborated on what it means to be capable of conversion into a cash equivalent. Although *Morrison-Knudsen* concluded that the pension plans at issue in that case could not be "converted into a cash equivalent on the basis of their market values," 461 U.S. at 630, 76 L. Ed. 2d at 199, 103 S. Ct. at 2049, the reasoning does not necessarily appear applicable to the terms of the retirement accounts in this case. The Supreme Court in *Morrison-Knudsen* rejected the respondent's suggestion that the benefits could be converted into a cash value "by reference to the employer's cost of maintaining these funds or to the value of the employee's expectation interests in them . . . ." *Id.*, 76 S.E.2d at 199-200, 103 S. Ct. at 2049. The Court concluded that the employer's cost "measures neither the employee's benefit nor his compensation." The Court explained:

It does not measure the benefit to the employee because his family could not take the 68¢ per hour earned by Mr. Hilyer to the open market to purchase private policies offering similar benefits to the group policies administered by the union's trustees. It does not measure compensation because the collec-

3. Although *Kirk*, 121 N.C. App. at 136, 465 S.E.2d at 306, also held that "contributions by the State to insure an employee under a health plan is not an allowance made 'in lieu of wages' within the meaning of this statute," the allowance-in-lieu-of-wages provision, for reasons discussed above, is not at issue here.

tive-bargaining agreement does not tie petitioner's costs to its workers' labors. . . . He derives benefit from the Pension and Disability Fund according to the "pension credits" he earns. These pension credits are not correlated to the amount of the employer's contribution; the employer pays benefits for every hour the employee works, while the employee earns credits only for the first 1,600 hours of work in a given year. Furthermore, although the employer is never refunded money that has been contributed, the employee can lose credit if he works less than 200 hours in a year or fails to earn credit for four years. Significantly, the employee loses all advantage if he leaves his employment before he attains age 40 and accumulates 10 credits.

*Id.* at 630-31, 76 L. Ed. 2d at 200, 103 S. Ct. at 2049.

By contrast, in this case, the record contains evidence from which the Commission could find that the employer's cost in at least the Pension Plan measures the employee's benefit and his compensation. Plaintiff offered evidence that the amount paid was tied to his specific labors—in other words, the hours that he worked. According to plaintiff, for every hour that he worked, he received a specific amount of money. The amount of money he earned was then deposited into plaintiff's own, individual account and not an overall trust fund. If he were given this amount directly, he could invest it in a similar account, such as the 401(k) Savings Plan in which plaintiff was already permitted to deposit a percentage of his earnings or a private IRA account. Contrary to the Pension and Disability Fund in *Morrison-Knudsen,* plaintiff will not lose any of the amounts deposited in those accounts if he leaves his employment. The Commission did not consider the Supreme Court's discussion of the "employer's cost" and whether that reasoning fits the evidence in this case regarding the plan.

In *Morrison-Knudsen,* the Supreme Court also rejected the respondent's alternative argument that the value of the trust funds could be calculated based on the value of "the employee's expectation interest" in them, holding that the employee's interest is "at best speculative," because employees have no voice in the administration of these plans and thus have no control over the level of funding or the benefits provided and because "the value of each fund depends on factors that are unpredictable." *Id.* at 631, 76 L. Ed. 2d at 200, 103 S. Ct. at 2049. For the Pension and Disability Fund at issue in that case, the Court observed that its value "depends on whether [the employee's] interest vested . . . ." *Id.*

The Commission, in this case, appears to have focused entirely on this allusion to "speculative" benefit to the employee, a factor also considered by this Court in *Kirk*. Yet, the Commission did not address the fact that plaintiff's interest in the retirement benefits, in contrast to *Morrison-Knudsen*, was vested, thus eliminating the sole concern of the Supreme Court with respect to pension plans.

The speculative nature of any benefit was the primary concern of this Court in *Kirk*. Although *Kirk* found that the value of the benefits derived from having state-funded health insurance "cannot be quantified," such benefits were deemed unquantifiable because the state employee would only benefit from the insurance contributions if, and only if, he became sick and needed to visit a doctor. *Kirk*, 121 N.C. App. at 136, 465 S.E.2d at 306 ("A State employee receives the benefits of the State Health Plan only when needed.").

Similarly, in parsing Congress' exclusion of fringe benefits from "wages" under the Longshore Act, the Fourth Circuit in *Universal Maritime Serv. Corp. v. Wright*, 155 F.3d 311, 324 (4th Cir. 1998) (emphasis added), explained that "[t]he value that an employee derives from employer contributions to retirement, pension, life insurance, and similar benefit plans is too speculative to be readily converted into a cash equivalent *because the employee's right to obtain tangible benefits is contingent on fulfilling conditions that might never be satisfied.*" The Fourth Circuit ultimately concluded: "When an employee's right to a tangible benefit does not depend on contingent factors . . ., the value of the benefit is not too speculative to be readily converted into a cash equivalent under the [Longshore] Act. *As long as the employee earns an unconditional entitlement to a tangible benefit (even though the benefit may not be received until sometime in the future), the value of the benefit can be identified and calculated as a part of the employee's wages.*" *Id.* at 324 n.14 (emphasis added).

The Commission, however, in determining that the value of the benefit was speculative considered only the feasibility of estimating how much plaintiff could actually withdraw from his retirement accounts at any given time in the future, as reflected in the following findings of fact:

10. There was a period of 30 days between a participant's termination date and when employees could actually gain access to the funds in their retirement account. This period allowed defendant-employer's payroll department time to make any nec-

essary adjustments before the employee's account was withdrawn. Also, if an employee terminated employment before the age of 55 and chose to cash out his retirement account, he had 20% of the value withheld for taxes and was subject to an additional 10% early withdrawal penalty.

11. Although it would be possible to add up all of the various contributions and deferrals made into an employee's retirement fund over the course of his employment, the Commission finds that estimating how much an employee could actually withdraw at any given time would be virtually impossible because the amount could be higher or lower based upon the employee's investment gains and losses. In addition, any amount plaintiff has in his retirement account is subject to applicable state and federal taxes, as well as a 10% early withdrawal penalty if he cashed out prior to the age of 55, further complicating the quantification of his actual benefit.

In focusing on the question of quantification at some point in time in the future, the Commission lost sight of the more important question: plaintiff's actual earning capacity. *See Derebery v. Pitt County Fire Marshall*, 318 N.C. 192, 197, 347 S.E.2d 814, 817 (1986) (explaining that "the purpose of the average weekly wage basis" is to serve "as a measure of the injured employee's earning capacity"). The issue whether the employer's contributions will be subject to "investment gains and losses" in the future cannot be the determinative factor.

For example, there is no dispute here that the portion of plaintiff's wages that he chose to contribute to the Savings Plan should be included in his average weekly wage. Yet, the Commission's analysis would apply equally to those contributions. Just like defendant-employer's contributions, plaintiff's personal contributions will be subject to the vicissitudes of the stock market and would be subject to taxes and penalties if withdrawn early. Under the Commission's rationale, plaintiff's personal contributions to his Savings Plan account would have to be excluded from his "earnings" because intervening market fluctuations might result in "investment gains and losses." Nevertheless, we of course include as part of an employee's earnings the portion of his wages that he seeks to contribute to a 401(k) plan, such as the Savings Plan in this case.

The relevant point in time for "valuation" of those wages voluntarily contributed to the Savings Plan is the amount paid by the employer to the employee on payday. Logically, therefore, the ques-

SHAW v. U.S. AIRWAYS, INC.

[186 N.C. App. 474 (2007)]

tion whether a benefit paid by the employer is convertible into a cash equivalent should be considered as of the date the employer made the contribution and not some unspecified date in the future. *See Morrison-Knudsen*, 461 U.S. at 630, 76 L. Ed. 2d at 199, 103 S. Ct. at 2049 (focusing on whether "[t]he present value" of the employee benefits is "readily converted into a cash equivalent").

We believe the *Universal Maritime* test is an appropriate first step in determining whether an employee benefit can meet the standard set out in *Morrison-Knudsen* and adopted in *Kirk*: Did the employee earn "an unconditional entitlement to a tangible benefit (even though the benefit [might] not be received until sometime in the future)?" *Universal Maritime*, 155 F.3d at 324 n.14. If so, then *Morrison-Knudsen's* and *Kirk's* concern about the speculative nature of a benefit will have been addressed. In determining further whether the present value of the benefit is readily converted into a cash equivalent, the Commission should apply the reasoning in *Morrison-Knudsen* to see whether the proposed valuation "measures . . . the employee's benefit [or] his compensation." 461 U.S. at 630, 76 L. Ed. 2d at 200, 103 S. Ct. at 2049.

Such an analysis upholds the basic purpose of N.C. Gen. Stat. § 97-2(5), which is to ensure that, in determining the amount of compensation due, the result achieved is fair and just to both the injured worker and the employer. *See McAninch*, 347 N.C. at 130, 489 S.E.2d at 378 ("Ultimately, the primary intent of this statute is that results are reached which are fair and just to both parties."); *Loch v. Entm't Partners*, 148 N.C. App. 106, 110, 557 S.E.2d 182, 185 (2001) ("The primary intent of the N.C. Gen. Stat. § 97-2(5) is to make certain that the results reached are fair and just to both parties.").

The exclusion of tangible, unconditional benefits from an employee's pre-injury "earnings" could, in our view, unfairly hurt workers whose employment contracts call for greater amounts of so-called "fringe" benefits and lesser amounts of cash remuneration. Such an average weekly wage would not necessarily provide an accurate measure of earning capacity. On the other hand, by limiting inclusion to benefits that meet the concerns set forth in *Morrison-Knudsen* and *Kirk*, employers are protected from an unreasonable expansion of the concept of "earnings."

We hold, in short, that the Commission acted under a misapprehension of the law when it concluded that defendant-employer's contributions to plaintiff's two retirement accounts should not be

included in the calculation of plaintiff's average weekly wage. To the extent that the Commission believed that no fringe benefits should be included, that conclusion is not supported by the statute or prior case law. Further, the Commission did not consider proper factors in determining that the retirement contributions could not be readily converted into a cash equivalent. In this case, like the respondent in *Morrison-Knudsen*, plaintiff argues that the amount paid by the employer is a proper measure of value. After determining whether plaintiff was entitled to an unconditional tangible benefit, the Commission should have followed the reasoning in *Morrison-Knudsen* in assessing whether the employer's contributions measure plaintiff's benefit or his compensation.

It is well established that where "the conclusions of the Commission are based upon a . . . misapprehension of the law, the case should be remanded so 'that the evidence [may] be considered in its true legal light.' " *Clark v. Wal-Mart*, 360 N.C. 41, 43, 619 S.E.2d 491, 492 (2005) (quoting *McGill v. Town of Lumberton*, 215 N.C. 752, 754, 3 S.E.2d 324, 326 (1939)). Accordingly, we reverse the Commission's opinion and award and remand this matter so that the Commission may consider the evidence anew under the proper legal standard.

We note that, in some of its findings, the Commission did not consider each of the retirement plans individually. On remand, the Commission should make specific findings of fact relating to each plan and make a separate determination as to whether the employer contribution for that plan should be included in calculating the average weekly wage. We leave to the discretion of the Commission whether to accept additional evidence relating to this issue.

As a final matter, we urge the General Assembly to review N.C. Gen. Stat. § 97-2(5). Our Workers' Compensation Act is a comprehensive statutory "compromise between the employer's and employee's interests." *Whitley v. Columbia Lumber Mfg. Co.*, 318 N.C. 89, 98, 348 S.E.2d 336, 341 (1986). The definition of "average weekly wage" in N.C. Gen. Stat. § 97-2(5) is a central element of this compromise. In other states, the legislature has clarified its intent after their states' appellate courts have struggled to decide how to treat fringe benefits. Because of the prevalence of benefits such as those in this case, we believe guidance by the General Assembly in this area is critical.

Reversed and remanded with instructions.

Judge ELMORE concurs.

SHAW v. U.S. AIRWAYS, INC.

[186 N.C. App. 474 (2007)]

Judge HUNTER dissents in a separate opinion.

HUNTER, Judge, dissenting.

Because I would affirm the Full Commission's holding in this case, I respectfully dissent.

I believe the majority opinion is based on misinterpretations of the relevant statute and case law, expanding the meaning of each to an impermissible and illogical extent. Any more detailed mandates on what may and may not be included in these computations must come from our legislature, not from this Court, and as such remand to the Commission is inappropriate.

## I. N.C. Gen. Stat. § 97-2(5)

Here, with irrelevant portions removed, is the statute at issue:

(5) Average Weekly Wages.—[First method:] "Average weekly wages" shall mean the earnings of the injured employee in the employment in which he was working at the time of the injury during the period of 52 weeks immediately preceding the date of the injury . . . . [Second method:] Where the employment prior to the injury extended over a period of fewer than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; *provided, results fair and just to both parties will be thereby obtained.* [Third method:] Where, by reason of a shortness of time during which the employee has been in the employment of his employer or the casual nature or terms of his employment, it is impractical to compute the average weekly wages as above defined, regard shall be had to the average weekly amount which during the 52 weeks previous to the injury was being earned by a person of the same grade and character employed in the same class of employment in the same locality or community.

[Fourth method:] *But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury.*

SHAW v. U.S. AIRWAYS, INC.

[186 N.C. App. 474 (2007)]

Wherever allowances of any character made to an employee in lieu of wages are specified part of *the wage contract, they shall be deemed a part of his earnings.*

N.C. Gen. Stat. § 97-2(5) (2005) (emphasis added).[4]

### A. "Unfairness"

The majority opinion makes much of the fact that the statute authorizes the modification of the statutory methods of calculation where unfairness would result. This is a misinterpretation of the plain language of the statute.

The italicized portions of the statute above are the only sections in which "fairness" is discussed. As our Supreme Court has noted, the statute provides an "order of preference" for which method of calculation is to be used, and "the primary method, set forth in the first sentence, is to calculate the total wages of the employee for the fifty-two weeks of the year prior to the date of injury and to divide that sum by fifty-two." *McAninch v. Buncombe County Schools,* 347 N.C. 126, 129, 489 S.E.2d 375, 377 (1997). "The final method, as set forth [as the fourth method above], clearly may not be used unless there has been a finding that unjust results would occur by using the previously enumerated methods." *Id.* at 130, 489 S.E.2d at 378. Thus, the fourth method—that authorizing modification to prevent an unfair result—is a failsafe option to remedy those *exceptional cases* where the wage as calculated by one of the first three methods produced a result unfair to either party. That is, it is not a fourth alternative, equal to the others; it is a provision to resort to when to do otherwise would create injustice. It is also not a method for evaluating individual benefits for inclusion in this calculation.

### B. Plain language

North Carolina General Statute 97-2(5) does not cover the types of benefits at issue in this case. As defendants note, in 1929, when the North Carolina Workers' Compensation Act was enacted, the type of pension plans at issue here were almost nonexistent, and none of the ensuing amendments in the many years since have held that employer

---

4. As is clear from the language quoted, the statute provides two types of compensation that may be included in a computation of "weekly wages": (1) wages and (2) compensation received "in lieu of wages." As the majority notes, plaintiff does not argue to this Court that the benefits at issue should be considered compensation "in lieu of wages," and as such, the only way the benefits could be included in this calculation is if we were to consider them included in the term "wages."

SHAW v. U.S. AIRWAYS, INC.

[186 N.C. App. 474 (2007)]

contributions to such plans should be considered "wages" for the purpose of the Act, even though such contributions have been addressed in other statutes. *See, e.g.,* N.C. Gen. Stat. § 96-8(13)(b)(1) (2005) (stating " '[w]ages' shall not include: 1. Any payment made to, or on behalf of, an employee . . . from or to a trust that qualifies under the conditions set forth in sections 401(a)(1) and (2) of the Internal Revenue Code"). There is nothing in either the statute itself or the case law that supports such an expansion of the law. As the majority notes, many jurisdictions that have considered this question have held that general language in workers' compensation statutes should not be read to include pension contributions as part of "wages." *See, e.g., Barnett v. Sara Lee Corp.,* 97 Md. App. 140, 148-50, 627 A.2d 86, 90-91 (holding that "[h]ad it so intended, the Maryland legislature could have specified fringe benefits such as pension contributions within the 'wages' definition" and, since it did not, the Court would not expand the definition to include it) *cert. denied,* 332 Md. 702, 632 A.2d 1207 (1993); *Luce v. United Techs. Corp.,* 247 Conn. 126, 717 A.2d 747 (1998); *Antillon v. N.M. State Highway Dep't,* 820 P.2d 436, 440 (N.M. Ct. App. 1991).

The portion of *Larson's Workers' Compensation Law* quoted by the majority bears repeating here:

Workers' compensation has been in force in the United States for over eighty years, and fringe benefits have been a common feature of American industrial life for most of that period. Millions of compensation benefits have been paid during this time. Whether paid voluntarily or in contested and adjudicated cases, they have always begun with a wage basis calculation that made "wage" mean the "wages" that the worker lives on and not miscellaneous "values" that may or may not someday have a value to him or her depending on a number of uncontrollable contingencies. Before a single court takes it on itself to say, "We now tell you that, although you didn't know it, you have all been wrongly calculating wage basis in these millions of cases, and so now, after eighty years, we are pleased to announce that we have discovered the true meaning of 'wage' that somehow eluded the rest of you for eight decades," that court would do well to undertake a much more penetrating analysis than is visible in the [Circuit Court opinion in *Morrison-Knudsen,* reversed by the Supreme Court,] of why this revelation was denied to everyone else for so long.

5 Arthur Larson and Lex K. Larson, *Larson's Workers' Compensation Law* § 93.01[2][b], at 93-21 to -22 (2005). Even as it cites to this treatise, the majority opinion runs afoul of its warning.

### C. Guiding principles

The majority cites to *Deese v. Lawn and Tree Expert Co.*, 306 N.C. 275, 293 S.E.2d 140 (1982), as support for its statement that this Court cannot presume that our legislature intended to exclude all fringe benefits, including those at issue in the case at hand, from the definition of "wages." This conclusion, however, goes against *Deese's* statement of this Court's guiding principles in this type of interpretation:

> This Court has interpreted the statutory provisions of North Carolina's workers' compensation law on many occasions. In every instance, we have been wisely guided by several sound rules of statutory construction which bear repeating at the outset here. First, the Workers' Compensation Act should be liberally construed, whenever appropriate, so that benefits will not be denied upon mere technicalities or strained and narrow interpretations of its provisions. Second, such liberality should not, however, extend beyond the clearly expressed language of those provisions, and our courts may not enlarge the ordinary meaning of the terms used by the legislature or engage in any method of "judicial legislation." Third, it is not reasonable to assume that the legislature would leave an important matter regarding the administration of the Act open to inference or speculation; consequently, *the judiciary should avoid "ingrafting upon a law something that has been omitted, which [it] believes ought to have been embraced."*

*Id.* at 277-78, 293 S.E.2d at 142-43 (citations omitted; alteration in original; emphasis added). The majority's opinion engages in precisely the type of judicial legislation and "ingrafting upon [the] law" that these principles forbid. The Workers' Compensation statute makes no mention of the types of benefits at issue here, and it is not the place of this Court to impose on the statute a concept or language that it believes the legislature should have included. As can be seen from the quote above, the only alternative to a basic wage calculation is when certain benefits have been offered "in lieu of wages," and that portion of the statute has not been put in issue in this case. N.C. Gen. Stat. § 97-2(5). For this Court to hold that the statute does in fact cover a range of other benefits is tantamount to imposing our own language onto the statute.

## II. *Kirk* and *Morrison-Knudsen*

Essentially, here, the majority has taken two cases that exclude fringe benefits—*Morrison-Knudsen* and *Kirk*—and cobbled them together to support a holding that the benefits at issue here should *not* be excluded. An in-depth look at these two cases shows that they do not support the majority's holding.

### A. *Morrison-Knudsen*

*Kirk* mentions *Morrison-Knudsen* briefly, and the majority opinion in this case treats *Morrison-Knuden* as part of the foundation on which its opinion is built. However, that case dealt with a specific federal statute—the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 902(13)—and the language that the Court closely analyzed was substantially different than that at issue here:

> " 'Wages' means the money rate at which the service rendered is recompensed under the contract of hiring in force at the time of the injury, including the reasonable value of board, rent, housing, lodging, or similar advantage received from the employer, and gratuities received in the course of employment from others than the employer."

*Morrison-Knudsen Constr. Co. v. Director, OWCP*, 461 U.S. 624, 629, 76 L. Ed. 2d 194, 199 (1983) (quoting 33 U.S.C. § 902(13)). The essence of the Court's holding was that only benefits similar to " 'board, rent, housing, [or] lodging' " would be considered part of " 'wages' " under the statute, and the important quality that those benefits shared were their "present value that can be readily converted into a cash equivalent on the basis of their market values." *Id.* at 630, 76 L. Ed. 2d at 199. The Court's subsequent analysis and elaboration on this point show that this statement does not mean that if a benefit can be easily quantified it should be included; rather, it means that only benefits with some ascertainable present value—as opposed to a future, theoretical value—may be included in this calculation. That is, the types of benefits—compensation for rent or housing, for example—that may be (and frequently are) translated into simple cash payments added on to an employee's paycheck. These are the kinds of benefits that an employee could in all likelihood choose to have provided to him as a cash payment.

This is not true of the types of benefits at issue in *Kirk* or in the case at hand. In *Kirk*, the benefit was the employer's contribution to a trust fund for the employee's health insurance; in *Morrison-*

*Knudsen*, it was a union trust fund for a variety of health-related costs, including insurance and disability; here, it is the contribution to pension funds. In neither case could the employee go to the employer and demand that the benefits be ceased and, instead, that the employee begin receiving the benefits' cash equivalent.

### B. *Kirk*

The majority opinion misconstrues in several ways the holding of *Kirk v. State of N.C. Dept. of Correction*, 121 N.C. App. 129, 465 S.E.2d 301 (1995), *disc. review improvidently allowed*, 344 N.C. 624, 476 S.E.2d 105 (1996). *Kirk* is not, as the majority suggests, a mandate to analyze various benefits on a case-by-case basis to determine whether they can be converted into a cash equivalent, nor does it provide authority for this Court to do so.

In *Kirk*, this Court was presented with several issues related to a workers' compensation holding by the Industrial Commission. The last such issue related to whether it was error for the Commission not to include in the weekly wage calculation the amount paid by the State, Kirk's employer, for his health insurance. *Kirk*, 121 N.C. App. at 134, 465 S.E.2d at 305. Kirk argued that the Commission erred by making the calculation based on the method outlined by this portion of the statute, which the Court refers to as "method two":

> Where the employment prior to the injury extended over a period of fewer[5] than 52 weeks, the method of dividing the earnings during that period by the number of weeks and parts thereof during which the employee earned wages shall be followed; provided, results fair and just to both parties will be thereby obtained.

N.C. Gen. Stat. § 97-2(5). Kirk contended that the Commission should have instead made its calculations based on this provision: "But where for exceptional reasons the foregoing would be unfair, either to the employer or employee, such other method of computing average weekly wages may be resorted to as will most nearly approximate the amount which the injured employee would be earning were it not for the injury." *Id.*

This Court held that the latter method "should not be used unless the result under method two would be unjust." *Kirk*, 121 N.C. App. at 135, 465 S.E.2d at 305. As such, the Court concluded, "absent a find-

---

5. *Kirk* was decided based on the 1994 version of this statute; the only difference between that version and the 2005 version at issue in the case here is that the later version uses "fewer" where the earlier version used "less."

ing that method two produces an unfair result, the Commission did not err by excluding the State's contributions to Kirk's Health Plan in the calculation of Kirk's average weekly wages." *Id.* at 136, 465 S.E.2d at 306.

In *Kirk*, the Court cited to the United States Supreme Court's holding in *Morrison-Knudsen*, 461 U.S. 624, 76 L. Ed. 2d 194, for its reasoning that "wage means 'the money rate at which service is recompensed under the contract of hiring' and not 'fringe benefits that cannot be converted into a cash equivalent.' " *Kirk*, 121 N.C. App. at 136, 465 S.E.2d at 306. The Court then stated "[t]he same reasoning applies in the present case[,]" followed by a holding that no case law

> support[s] plaintiff's position that an unfair result is reached by not including the employer's contribution to Kirk's health care. A State employee receives the benefits of the State Health Plan only when needed. The value of this benefit cannot be quantified. After carefully considering the evidence, we cannot say that the Commission's failure to include such allowance produced an unfair result for the plaintiff.

*Id.*

This portion of the opinion makes it clear that the ease with which a benefit may be quantified is not the dispositive factor in this issue. The Court did not hold in *Kirk* that if a court *can* quantify or value a benefit, it must be included; rather, it says if you *cannot* quantify the benefit, that is one factor to consider in excluding the benefit from this calculation.

The majority's statement that "nothing in *Kirk* suggests that all fringe benefits should be excluded from the average weekly wage computation" is a very misleading summary of that case's holding. The Court does not consider the question of inclusion for all fringe benefits for the calculation of weekly wages in *Kirk*. Instead, the Court briefly considers whether the exclusion of a certain type of fringe benefit renders an unfair result under one of the primary statutory methods of calculating wages.

### III. Practical Effect

This Court's engaging in this type of judicial expansion, without the benefit of debate in the legislature as to benefits and drawbacks, will harm those employees not receiving workers' compensation: Employers will be encouraged to abandon their pension plans due to

the unanticipated increase in costs this holding would allow. Any general expansion of the types of compensation to be covered by this statute must come from our legislature. At any time, employers and employees as private parties are free to contract for *more* than what is required by the statute; that is, if the legislature were to clarify that certain benefits are *not* covered by the statutory term "wages," private parties may certainly execute an employment contract providing that, in this employee's case, such benefits *will* be considered part of the employee's wages for purposes of calculating wages under the workers' compensation statute.

## IV. Conclusion

I believe the majority opinion misconstrues the existing law in an attempt to extend it to cover benefits the statute itself does not contemplate. Any further clarification on this issue must come from our legislature, not from this Court ingrafting language upon the statute. Action on our part in the absence of the debate of merits and drawbacks inherent to the legislature will result in an inappropriate and uneven interpretation of this statute. As such, I respectfully dissent.